**GRAND RIVER ENTERPRISES SIX NATIONS, LTD., Plaintiff,**

v.

**Troy KING et al., Defendants.**

**No. 02 Civ. 5068(JFK).**

United States District Court, S.D. New York.

March 17, 2011.

Leonard Violi, Esq., Robert Luddy, Esq., Windels Marx Lane & Mittendorf, LLP, Marvin Lange, Esq., Marc Mukasey, Esq., Bracewell & Giuliani, LLP, for Plaintiff.

Office of the Attorney General of the State New York, of Counsel: Christopher Leung, Esq., New York City Law Department, Office of the Corporation Counsel, of Counsel: Dana Biberman, Esq., for Defendants.

### Opinion and Order

JOHN F. KEENAN, District Judge:

Plaintiff Grand River Enterprises Six Nations, Ltd. ("Grand River" or "Plaintiff") brings this action against the Attorneys General of Alabama, Alaska, Arizona, California, Colorado, Delaware, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Missouri, Montana, Nebraska, New York, North Carolina, Ohio, Oregon, South Carolina, South Dakota, Tennessee, Washington, Wisconsin, and Wyoming (collectively, the "States" or "Defendants") asserting Commerce Clause and Sherman Act violations stemming from each state's participation in a tobacco Master Settlement Agreement ("MSA"). Before the Court are Defendants' motions to exclude the expert reports of Drs. Ei-

senstadt and Bulow as well as cross motions for summary judgment.

## I. Background

The following facts are undisputed unless otherwise noted.[1]

### A. Overview of the MSA

In November 1998, the nation's four largest cigarette manufacturers entered into an agreement with forty-six states[2] and certain other jurisdictions (the "Settling States") settling pending and future claims in exchange for annual payments by the cigarette companies to compensate the states for health care costs associated with the treatment of tobacco-related illnesses. This agreement is embodied in the MSA. The four major tobacco companies who initially negotiated and signed onto the MSA are known as the original participating manufacturers ("OPMs"). Other tobacco manufacturers may elect to participate in the MSA at any time and be released from liability for any claims the Settling States could bring in exchange for specified settlement payments; these are known as subsequent participating manufacturers ("SPMs"). To encourage early participation, the MSA created special incentives for any manufacturer that signed on within sixty (later changed to ninety) days of its execution; this subset of manufacturers is known as the "grandfathered SPMs." Some manufacturers continue to sell cigarettes in the United States without joining the MSA; these are referred to as non-participating manufacturers ("NPMs"). Each Settling State receives a stipulated portion or "allocable share" of annual MSA payments. For example, New York receives 12.76% of total OPM, SPM, and grandfathered SPM MSA payments each year. (MSA Ex. A).

The MSA defines settlement payments for each group of tobacco manufacturers that participate in the MSA. With respect to OPMs, the MSA sets forth base amounts these companies collectively are required to pay to the Settling States each year. For example, in 2011, the base payment for OPMs is $8.139 billion. (MSA § IX(c)(1)). Each OPM pays a proportion of the base amount equal to its relative market share of the total number of cigarettes shipped by the OPMs in or to the fifty states, the District of Columbia, and Puerto Rico during the preceding year. (*Id.*; MSA § II(mm)). These base payments are subject to certain adjustments, including: (1) an upward adjustment for inflation (MSA § IX(c)(1); Ex. C); (2) a "volume adjustment" that reduces the base payment if the total number of cigarettes shipped in or to the U.S. market drops below a specified level (MSA § IX(c)(1); Ex. E); and (3) a downward "NPM Adjustment" that generally reduces the base payment by three times the amount of any market share OPMs lost to NPMs in a preceding year. (MSA § IX(d)).[3]

---

1. To the extent any information filed under seal is discussed in this Opinion, that information is hereby unsealed in light of the strong presumption of public access.

2. Florida, Minnesota, Mississippi, and Texas settled with these manufacturers prior to the consummation of the MSA.

3. The NPM Adjustment only comes into play if: (1) an economic consulting firm determines that disadvantages experienced as a result of the MSA were a "significant factor contributing to the Market Share Loss" (MSA § IX(d)(1)(C)); and (2) the Settling State receiving MSA payments has not passed or enforced an Escrow Statute. (MSA § IX(d)(2)). "An arbitrator has found that disadvantages in the MSA were a significant factor in the increase in NPM Market Share for the years 2003–2005, but to date no State has been found to lack a qualifying statute or to have failed to have diligently enforced its qualifying statute." (Gruber Rep. ¶ 4).

SPMs pay a percentage of OPM base payments depending in part on their relative market shares. (MSA § IX(i)). SPM payments are also subject to the inflation adjustment and the NPM Adjustment. (MSA § IX(i)(3)). However, grandfathered SPMs are permitted to exempt a certain number of cigarettes from their payment obligations. This "grandfathered share" is equal to the greater of 125% of an SPM's 1997 market share of total U.S. cigarette sales or 100% of its 1998 market share of total U.S. cigarette sales. (MSA § IX(i)(1)). Thus, grandfathered SPMs only make MSA payments on cigarettes sold in excess of their grandfathered share.

## B. Escrow and Contraband Statutes

Since NPMs do not make MSA payments, there was a concern that they could use this advantage to gain market share from OPMs and SPMs, in turn imposing unreimbursed healthcare costs on the Settling States. The MSA's solution to this problem came in the form of Escrow Statutes, with model legislation included at Exhibit T to the agreement. The Escrow Statutes aim to "effectively and fully neutralize[ ] the cost disadvantages that the Participating Manufacturers experience vis-à-vis Non–Participating Manufacturers within such Settling State as a result of the provisions of this Agreement," (MSA § IX(d)(2)(E)), by requiring NPMs that sell cigarettes in-state either to: (1) join the MSA and make settlement payments; or (2) pay a specified amount per cigarette sold in-state into an escrow fund used to satisfy any judgment the Settling State should win against the NPM. All of the Defendant States, along with all other Settling States, have enacted substantially similar Escrow Statutes. *See* Ala.Code § 6–12–3; Alaska Stat. § 45.53.020; Ariz. Rev.Stat. Ann. § 44–7101; Cal. Health & Safety Code § 104557; Colo.Rev.Stat.

Ann. § 39–28–203; Del.Code Ann. tit. 29, § 6082; Ga.Code Ann. § 10–13–3; Idaho Code Ann. § 39–7803; 30 Ill. Comp. Stat. 168/15; Ind.Code § 24–3–3–12; Iowa Code § 453C.2; Kan. Stat. Ann. § 50–6a03; La. Rev.Stat. Ann. § 13:5063; Me.Rev.Stat. Ann. tit. 22, § 1580–I; Md.Code Ann. Bus. Reg. § 16–403; Mass. Gen. Laws Ann. ch. 94E, § 2; Mich. Comp. Laws § 445.2052; Mo. Ann. Stat. § 196.1003; Mont.Code Ann. § 16–11–403; Neb.Rev.Stat. § 69–2703; N.Y. Pub. Health Law § 1399–pp; N.C. Gen.Stat. § 66–291; Ohio Rev.Code Ann. § 1346.02; Or.Rev.Stat. § 323.806; S.C.Code Ann. § 11–47–30; S.D. Codified Laws § 10–50B–7; Tenn.Code Ann. § 47–31–103; Wash. Rev.Code Ann. § 70.157.020; Wis. Stat. § 995.10; Wyo. Stat. Ann. § 9–4–1202. The NPM retains ownership of and earns interest on the funds while they are held in escrow, a period generally lasting twenty-five years.

As originally enacted, the Escrow Statutes included an "allocable share release" provision through which an NPM could secure release of any escrow funds in excess of "the State's allocable share of the total payments that such manufacturer would have been required to make in that year under the Master Settlement Agreement . . . had it been a participating manufacturer." (Model Escrow Statute, MSA Ex. T–4). In other words, an NPM could recoup any escrow funds that exceeded the amount the Settling State would have received in MSA payments had the NPM been an SPM. This loophole allowed an NPM that concentrated its sales in a single state or small number of states to obtain release of most of its escrow deposits. Therefore, beginning in 2003, all of the Settling States except Missouri amended the allocable share release provision in their Escrow Statutes such that an NPM is entitled to the release of escrow only to the extent the escrow deposit in a given state exceeds the amount the NPM would

have paid had it joined the MSA as an SPM. *See, e.g.,* N.Y. Pub. Health Law § 1399–pp(2)(b)(ii).

In order to enforce compliance with the Escrow Statutes, the Settling States enacted complementary Contraband Statutes. The Contraband Statutes generally provide that an NPM's cigarettes cannot receive an excise tax stamp for sale, and therefore cannot be sold, in a Settling State absent an NPM's certification that it is in compliance with the state's Escrow Statute. Violation of a Contraband Statute may result in civil monetary penalties, suspension or cancellation of a distributor's license to stamp cigarettes, and/or seizure of an NPM's cigarettes. *See, e.g.,* N.Y. Tax Law §§ 480–b, 481(1)(c), 1846. In some states, these statutes, known as "complementary legislation," establish a directory of manufacturers approved to sell cigarettes in-state. *See, e.g.,* Ala.Code § 6–12A–3.

### C. Payments to the Settling States

The following information is taken from the report of the States' expert Dr. Jonathan Gruber. The Court emphasizes that Plaintiff has not objected to the admissibility of Dr. Gruber's report, nor has it submitted contradictory empirical data. OPM MSA payments in 2007 were approximately $5.29953 per carton or $0.02650 per cigarette. (Gruber Rep. ¶ 5). SPM MSA payments in 2007 for cigarettes sold in excess of any grandfathered share were approximately $5.06638 per carton or $0.02533 per cigarette. (*Id.* ¶ 7). NPM escrow payments in 2007 were approximately $5.02138 per carton or $0.025107 per cigarette. (*Id.* ¶ 8).

Grandfathered SPM payments are slightly different. Grandfathered SPMs that sell at or below their grandfathered share make no MSA payments. Plaintiff submits that this exemption provides grandfathered SPMs with a competitive advantage over NPMs. However, Dr. Gruber notes that the vast majority of grandfathered SPMs sell above their grandfathered share, at which point they made the 2007 $0.02533 per-cigarette MSA payment. (*Id.* ¶ 17; Leung Decl., Ex. Z (listing fifteen grandfathered SPMs in 2008, only three of which sold below their grandfathered share)). While a grandfathered SPM's average per-cigarette MSA payment is lower than both OPM MSA payments and NPM escrow payments, the marginal cost of producing each cigarette above the grandfathered share is still higher than the cost increases NPMs incur due to escrow payments and lower than the cost increases of OPMs. To be sure, the MSA regulatory scheme imposes additional costs on all cigarette manufacturers, but the NPMs' escrow costs are less than OPMs' and SPMs' MSA payments. (Gruber Rep. ¶¶ 20–23).

OPMs, SPMs, and NPMs likely pass on these costs to consumers in the form of higher cigarette prices. But the differential in cost increases should logically create an opportunity for continued competition among OPMs, SPMs, and NPMs. Indeed, after the implementation of the MSA, NPM market share grew markedly, from about 0.4% of the market in 1997 to slightly more than 8% in 2003. (Eisenstadt Rep. ¶ 12). Although NPM market share subsequently declined to about 5.4% in 2007,[4] NPMs have substantially increased their share of the U.S. cigarette market since the inception of the MSA. This increase occurred in a shrinking cigarette market. Overall, this evidence paints a

---

4. Judge Hellerstein attributed the decline in total NPM market share from 2003 to 2007 to the fact that General Tobacco, a large NPM, joined the MSA as an SPM in July of 2004. *Freedom Holdings, Inc. v. Cuomo,* 592 F.Supp.2d 684, 691 n. 5 (S.D.N.Y.2009).

picture of an actively competitive cigarette market.

## D. Grand River

Grand River is a Canadian tobacco manufacturer owned by First Nations members of the Iroquois Confederacy. Grand River operates on Six Nations' reservation land in Ontario. Grand River's Seneca brand cigarettes are imported into the United States through two companies, Native Wholesale Supply and Tobaccoville USA, Inc. Native Wholesale Supply sells Seneca brand cigarettes exclusively on Native American reservations in the United States. Tobaccoville imports Seneca brand cigarettes and distributes them off-reservation in several states. Because Grand River is an entity that "manufactures cigarettes anywhere that such manufacturer intends to be sold in the United States," *see, e.g.,* N.Y. Pub. Health Law § 1399–*oo*(9)(a), the States consider Grand River to be an NPM. (Violi Decl. ¶ 3).

The undisputed deposition testimony establishes that Grand River and its distributors make independent pricing decisions. Jerry Montour, the *de facto* CEO of Grand River, testified that Grand River considers "potential for [sales] volumes in the future and long-term . . . [r]aw materials, wages, overhead, [and] profit" in determining the price at which it sells its cigarettes to Native Wholesale Supply and Tobaccoville. (Leung Decl., Ex. G, Deposition of Jerry Montour at 293–94). Grand River's pricing to Native Wholesale Supply and Tobaccoville is not affected by OPM, SPM, or NPM price changes. For example, Mr. Montour explained that "[i]f Marlboro or any of the other larger manufacturers choose to have a price increase because they are able to bear it in the U.S. market, no, we do not necessarily react to that by raising our costs to Tobaccoville." (*Id.* at

675). Similarly, Grand River's price point does not change in response to: an OPM's decision to increase the price of a premium brand of cigarettes (*id.* at 673–75); an OPM's decision to increase the price of a discount brand of cigarettes (*id.* at 676); a grandfathered SPM's decision to increase prices (*id.* at 678–80); or another NPM's decision to raise prices of a fourth-tier brand of cigarettes similar to Grand River's Seneca brand. (*id.* at 681).

Native Wholesale Supply and Tobaccoville set the price of Grand River cigarettes for the U.S. market. Arthur Montour, the sole owner and president of Native Wholesale Supply, testified that the MSA and Escrow Statutes have no affect on the price Native Wholesale Supply charges for Grand River cigarettes in Native American territories. (Leung Decl., Ex. K, Deposition of Arthur Montour at 295, 298). Larry Phillips, the president of Tobaccoville, explained that Tobaccoville has the discretion to sell Grand River cigarettes in any state, as long as it does not sell in Native American territory. (Leung Decl., Ex. J, Deposition of Larry Phillips at 64). As of June 2008, Tobaccoville sold Grand River cigarettes in North Carolina, South Carolina, Tennessee, and Georgia,[5] as well as in three non-MSA states. (*Id.* at 72). Tobaccoville sets the price for Grand River cigarettes sold in each state; no state has limited the number of cigarettes that can be sold or directed Tobaccoville to sell cigarettes at a particular price, either in that state or in any other state. (*Id.* at 92–94, 150–52). In fact Mr. Phillips testified that Tobaccoville has sold Seneca brand cigarettes at a loss in Tennessee, at the same time that it charged a profit-producing price in North Carolina and

---

5. As of August 2009, it appears that Grand River cigarettes are no longer sold off-reservation in Georgia. (Decl. of Steve Williams at ¶ 11).

Georgia. (*Id.* at 75–76). In setting its prices, Tobaccoville considers the cost of purchasing cigarettes from Grand River, the federal excise tax, the U.S. Department of Agriculture tobacco settlement cost, escrow payments, and its own profit. (*Id.* at 72–74, 82). Seneca cigarettes are not the cheapest brand on the market; instead, Tobaccoville sets its price based on what the market will bear. (*Id.* at 80, 135, 151).

## E. Procedural History

Grand River filed its initial complaint in 2002, alleging that the MSA and its implementing legislation violated the dormant Commerce Clause, the Foreign Commerce Clause, the Indian Commerce Clause, the Sherman Act, the Equal Protection Clause, the Due Process Clause, the First Amendment, 42 U.S.C. § 1983, and that the MSA was preempted by the Federal Cigarette Labeling and Advertising Act. On September 29, 2003, this Court dismissed all claims against the Attorneys General of each state except New York pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction; it also granted Defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim as to all States. *See Grand River Enters. Six Nations, Ltd. v. Pryor,* No. 02 Civ. 5068, 2003 WL 22232974 (S.D.N.Y. Sept. 29, 2003). On July 15, 2004, the Court granted Plaintiff's motion for reconsideration of the November 29, 2003 ruling and reinstated the Sherman Act claim against the New York Attorney General in light of the Second Circuit's decision in *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205 (2d Cir.2004), a case presenting claims essentially identical to those in the case at bar. *See Grand River Enters. Six Nations, Ltd. v. Pryor,* No. 02 Civ. 5068, 2004 WL 1594869 (S.D.N.Y. July 15, 2004). On November 3, 2004, the Court granted Plaintiff's Rule 54(b) motion and directed entry of final judgment so that Grand River could appeal the Rule 12(b)(2) and 12(b)(6) dismissals. *See Grand River Enters. Six Nations, Ltd. v. Pryor,* No. 02 Civ. 5068, 2004 WL 2480433 (S.D.N.Y. Nov. 3, 2004).

On appeal, the Second Circuit found that this Court could exert personal jurisdiction over the non-New York Defendants. Therefore, the Second Circuit reversed in part and reinstated the Commerce Clause claim, finding that Plaintiff had stated "a possible claim that the practical effect of the challenged statutes and the MSA is to control prices outside of the enacting states by tying both the SPM settlement and NPM escrow payments to national market share, which in turn affects interstate pricing decisions." *Grand River Enters. Six Nations, Ltd. v. Pryor,* 425 F.3d 158, 173 (2d Cir.2005).

Plaintiff subsequently moved for a preliminary injunction preventing the Defendant States from enforcing the amended allocable share provisions of their Escrow Statutes. Following a three day hearing, the Court found that Grand River was not likely to suffer irreparable harm or to succeed on the merits of its Sherman Act and Commerce Clause claims. *See Grand River Enters. Six Nations, Ltd. v. Pryor,* No. 02 Civ. 5068, 2006 WL 1517603, at *8–10 (S.D.N.Y. May 31, 2006). The Second Circuit affirmed the denial of an injunction on the grounds that Grand River did not demonstrate a likelihood of irreparable harm. *Grand River Enters. Six Nations, Ltd. v. Pryor,* 481 F.3d 60 (2d Cir.2007) (per curiam).

On November 9, 2009, the parties filed the instant cross motions for summary judgment.

## II. Evidentiary Motions

Before delving into the summary judgment analysis, the Court must first determine what evidence may be considered in

support of the parties' respective motions. *See Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."). As previously mentioned, the States have submitted the expert report of Dr. Jonathan Gruber, and Grand River does not contest its admissibility. Grand River has submitted the expert reports of Dr. David Eisenstadt and Dr. Jeremy Bulow. The States move to exclude Grand River's expert reports under Rule 702 of the Federal Rules of Evidence. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

■■■ Rule 702 requires the district court to act as a gatekeeper to ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Thus, in assessing admissibility, the court must first determine whether the proffered expert testimony is relevant, that is whether it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Then, the court considers whether "the reasoning or methodology underlying the testimony is scientifically valid and ... whether that

reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786. *Daubert* set forth a non-exclusive list of factors that the court might consider in gauging the scientific validity of proffered testimony, including: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error and whether standards and controls exist and have been maintained with respect to the technique; and (4) the general acceptance of the methodology in the scientific community. *Id.* at 593–95, 113 S.Ct. 2786.

■■■ In assessing the reliability of proffered expert testimony, the court must "focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 266 (2d Cir.2002). "Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996) (per curiam) (internal quotations and citations omitted). In other words, Rule 702 "embodies a liberal standard of admissibility for expert opinions." *Nimely v. City of New York,* 414 F.3d 381, 395 (2d Cir.2005).

■■■ Dr. Eisenstadt holds a Ph.D. in Economics from the University of Illinois at Urbana–Champaign. After completing his doctoral studies, Dr. Eisenstadt worked as a Senior Economist at the Antitrust Division of the U.S. Department of

Justice. In 1991, he founded a private consulting company which offers economic advice to clients in antitrust and other litigation.

The overarching theme of Dr. Eisenstadt's September 29, 2008 initial report is that the NPM Adjustment provision in the MSA provides an incentive for OPMs to raise cigarette prices more than necessary to recoup MSA costs, in turn "shedding" market share to NPMs in order to reap the benefit of the NPM Adjustment and lower their MSA payments. He performs three analyses to link historical OPM price increases to the NPM Adjustment in support of his proposition that the MSA has an adverse effect on competition. Specifically, Dr. Eisenstadt conducted: (1) a game theory analysis, which indicates that the NPM Adjustment caused OPMs to increase their prices by approximately $0.02 to $0.05 per pack (in 2007 dollars); (2) an oligopoly simulation, which suggests that the NPM Adjustment caused OPMs to increase their prices by approximately $0.06 per pack (in 2007 dollars); and (3) a regression analysis, which indicates that the NPM Adjustment caused OPMs to raise their prices by approximately $0.04 to $0.05 per pack (in 2007 dollars). (Eisenstadt Rep. ¶ 89).

On May 14, 2009, Dr. Eisenstadt submitted a supplemental report to address questions raised by defense counsel during his deposition. After adjusting his analyses to account for various issues highlighted by defense counsel, Dr. Eisenstadt again concluded that the NPM Adjustment caused OPMs to raise their prices by between $0.01 and $0.05 per pack (in 1997 dollars). Additionally, Dr. Eisenstadt performed several new analyses to illustrate the amount of consumer loss attributable to: (1) the MSA and original Escrow Statutes;

(2) the original Escrow Statutes alone; and (3) the current Escrow Statutes as amended to change the allocable share release provision.

There is no contention that Dr. Eisenstadt is unqualified to offer an expert opinion in this case. Instead, Defendants attack alleged flaws in Dr. Eisenstadt's models which render his conclusions unreliable. Specifically, Defendants argue that the game theory analysis fails to explain cigarette prices in time periods outside of those he considered, considers only two OPMs selling two products each, which is not reflective of the actual cigarette market, and contains two mathematical errors, including an "elasticities matrix" that produces economically impossible results. Regarding the oligopoly simulation, Defendants contend that Dr. Eisenstadt used the wrong discount rate when converting cigarette prices to 1997 dollars and that his model fails to account for attorneys' fees the OPMs must pay. Finally, Defendants argue that Dr. Eisenstadt's regression analysis, which includes a factor called NPMADJOPPCOST that is meant to represent an OPM's potential NPM Adjustment, does not take into account historical declines in the volume of cigarettes sold between 1997 and 2003 and is overly influenced by two outlier data points.

It is important to note that Defendants in no way challenge the scientific validity of game theory analysis, oligopoly simulation, or regression analysis. There is no dispute that these are textbook economic methodologies which are generally accepted and widely used by economists to predict prices in various contexts. Instead, Defendants question certain data Dr. Eisenstadt used in his calculations and conclusions he drew from the results.[6]

---

**6.** The Court notes that there are serious conceptual issues with Dr. Eisenstadt's "shed-
ding" market share theory. First, it assumes that OPMs shed market share to NPMs but

These arguments do not diminish the reliability of the process or methodology employed. *See Amorgianos,* 303 F.3d at 267 ("A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible. The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." (internal quotation omitted)).

■ Dr. Bulow received his Ph.D. in Economics from the Massachusetts Institute of Technology. He served as the Director of the Bureau of Economics of the Federal Trade Commission from 1998 to 2001, and currently works as a Professor of Economics at Stanford University's Graduate School of Business. He has published extensively in the areas of microeconomic theory, corporate finance, and pensions, and on the topic of tobacco taxes and the MSA. Dr. Bulow's September 29, 2008 report sets forth three main propositions: (1) the MSA and its implementing legislation are in essence a set of national excise taxes; (2) the MSA and its implementing legislation operate extraterritorially in that the regulatory payment scheme in each Settling State depends on commercial activity nationwide; (3) the Allocable Share Amendments show that the MSA is an inter-connected and coercive state regulatory scheme. (Bulow Rep. at 2–3).

There is no question as to Dr. Bulow's expert qualifications. However, unlike Dr. Eisenstadt, Dr. Bulow did not perform any mathematical or statistical analyses; his expert report is more of a white paper or policy statement about how the MSA and Escrow Statutes function. Dr. Bulow came to his conclusions by applying economic principles to a series of "thought experiments such as what would happen if there were small changes in one or more company's sales." (*Id.* at 6). Dr. Bulow's report is not "scientific" in nature and is difficult to fit into the *Daubert* framework. *See Liriano v. Hobart Corp.,* 949 F.Supp. 171, 177 (S.D.N.Y.1996) ("It is not appropriate to invoke the *Daubert* test in cases where expert testimony is based solely on experience or training, as opposed to a methodology or technique. Indeed, it would be impossible to do so."). Instead, the Court considers whether the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. The usefulness of Dr. Bulow's explanation of the mechanics of the MSA and Escrow Statutes in turn depends on the question of relevance.

The Court recognizes that a determination of relevance under Rule 401 is generally the first step in a *Daubert* analysis. The problem in this case is that Plaintiff commissioned three expert reports, but does not rely on any of them in support of its motion for summary judgment and only fleetingly refers to Dr. Eisenstadt's initial report and Dr. Bulow's report in its opposition to the States' motion for summary judgment. Indeed, Plaintiff acknowledges that the expert reports were written months prior to the summary judgment briefs, and Plaintiff may well have chosen

---

not to SPMs, an outcome that is simply not in the power of the OPMs to control. Additionally, it ignores the fact that increased competition from NPMs alone is not enough to trigger the NPM Adjustment. No matter how much market share OPMs lose to NPMs, the NPM Adjustment will not apply in a Settling State that has passed and diligently enforced an Escrow Statute, nor will it apply without a

finding that the disadvantages of the MSA were a significant factor contributing to the loss of market share. Thus, the MSA itself may derail Dr. Eisenstadt's incentive theory if OPMs are never able to recoup lost profits with the NPM Adjustment. However, these concerns stem from Dr. Eisenstadt's conclusions, not his methodology, and therefore are not grounds for exclusion.

to pursue arguments different from those raised by their experts. The fact that Plaintiff does not rely on Drs. Eisenstadt and Bulow raises serious questions about the relevance of the evidence to the surviving claims, but there seems little point in making a paragraph-by-paragraph assessment of the relevance of evidence that is, for all intents and purposes, not being offered. A broad ruling excluding the evidence in its entirety is little more than an academic exercise. As Drs. Eisenstadt and Bulow are otherwise qualified to give expert opinions, the Court will consider the relevance of those pieces of the expert reports Plaintiff does refer to in the course of the Sherman Act and Commerce Clause analysis. The Court makes no finding with respect to the rest of Defendants' challenges to the reports under Rule 401. Dr. Eisenstadt's supplemental report is not mentioned once in either party's papers, so the Court sees no reason to determine its admissibility at this time.

## III. Substantive Claims

Summary judgment is appropriate when the pleadings and admissible evidence show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine dispute exists for summary judgment purposes "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir.2008) (citing *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir.2007)). In determining whether summary judgment is appropriate, a

court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### A. Sherman Act

Plaintiff presents a multi-layered antitrust attack on the MSA, Escrow Statutes, and Contraband Statutes. First, Plaintiff argues that the MSA, as implemented by the Escrow and Contraband Statutes, is a *per se* violation of § 1 of the Sherman Act. On the basis of this *per se* violation, Plaintiff contends that the Escrow and Contraband Statutes are preempted by federal antitrust law. In connection with the preemption claim, Plaintiffs argue that the Escrow Statutes are not saved by the state action immunity doctrine of *Parker v. Brown.*

#### 1. *Per Se* Violation

Unlike the *Freedom Holdings* plaintiff, Grand River challenges the MSA as well as its implementing legislation. Plaintiff moves for summary judgment on the sole ground that the MSA is an agreement among competitors to raise their own and their rivals' costs, which is a *per se* violation of § 1 of the Sherman Act.

##### a. Standing

■ The Second Circuit's most recent opinion in *Freedom Holdings* raises an important issue with respect to Grand River's standing to challenge the MSA, which the Court will address *sua sponte*.[7] In order to obtain the injunctive relief it seeks, a private plaintiff must demonstrate that it is threatened with "loss or damage by a violation of the antitrust laws." *Clayton Act § 16, 15 U.S.C. § 26. This so-

---

7. The Court assumes that Plaintiff has Article III standing. The States have not suggested

otherwise.

called antitrust injury must be "the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 113, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *cf. Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (plaintiff seeking treble damages under § 4 of the Clayton Act must show antitrust injury that "reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation"). Thus, "[t]he antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

■ Grand River argues that the MSA is an agreement among competitors not only to raise their own costs (and, consequently, prices), but also an agreement to raise NPMs' costs. As an initial matter, the MSA standing alone cannot and does not impose any obligations on NPMs. The MSA embodies an agreement by OPMs and SPMs to pay settlement costs to the Settling States; following Plaintiff's theory, the MSA would be an agreement among competitors to shoulder additional costs, which, without reference to Escrow Statutes, benefits NPMs. The MSA does provide for a model Escrow Statute as a mechanism to offset price advantages NPMs gain by not having to make MSA settlement payments; however, it is the implementing Escrow Statutes, which were passed and are enforced by the States, not the MSA itself, that affect NPMs' costs. Indeed, Plaintiff cannot point to any injury occasioned by the MSA operating apart from its implementing legislation. As the Second Circuit noted, an NPM cannot directly challenge the MSA even though "a conspiracy among MSA participating manufacturers to fix prices or to divide the cigarette market among themselves would certainly violate the antitrust laws [because] such a violation would not threaten plaintiffs with loss or damage." *Freedom Holdings, Inc. v. Cuomo,* 624 F.3d 38, 51–52 (2d Cir.2010) (internal citations omitted).

Nevertheless, given the interlocking nature of the MSA and Escrow and Contraband Statutes, it is at least arguable that increased NPM costs are attributable to the MSA. However, the NPMs' increased costs, in the form of escrow payments, are still less than the MSA costs of OPMs, SPMs, and grandfathered SPMs selling in excess of their grandfathered share. Any cost increases the MSA levies against NPMs are counterbalanced by the greater cost increases the OPMs and SPMs took upon themselves in the form of MSA settlement payments. Indeed, the NPMs' overall increase in market share since the MSA went into effect evidences the fact that the MSA has not impeded NPMs' ability to compete. Moreover, Plaintiff's own expert Dr. Eisenstadt contends that the MSA incentivizes OPMs to raise cigarette prices in order to cede market share to NPMs; assuming without deciding that this is true, the MSA would be an agreement among competitors to allow rival NPMs to flourish in an attempt to trigger the NPM Adjustment to reduce their own MSA payments. In other words, the MSA provides NPMs with a competitive advantage even taking into account the cost-increasing escrow payments. Even if the MSA is an agreement among competitors to raise rivals' costs, Plaintiff has not demonstrated an antitrust injury flowing from this agreement, and therefore lacks standing to challenge the MSA directly.

### b. Raising Rivals' Costs

Although the Court finds that Plaintiff does not have standing to challenge the MSA under the federal antitrust laws, it considers the Sherman Act challenge in an abundance of caution. Plaintiff argues that in the MSA, the OPMs agreed on a mechanism to impose specific per-cigarette costs on their competitors in the form of escrow payments, and this agreement constitutes price fixing.

■■■ Section 1 of the Sherman Act forbids "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Due to their "pernicious effect on competition and lack of any redeeming virtue," certain agreements are considered conclusively illegal without further analysis under the rule of reason. *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Horizontal price fixing—i.e., an agreement among competitors to fix prices—is a classic example of conduct deemed illegal *per se* under the Sherman Act. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980); *Arizona v. Maricopa County Med. Society*, 457 U.S. 332, 344–48, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) ("Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se."). Two federal Courts of Appeals have extended the definition of illegal price fixing to include agreements that fix costs, an element of price. Plaintiff relies on *National Electrical Contractors Association, Inc. v. National Constructors Association*, 678 F.2d 492 (4th Cir.1982), and *Premier Elec-trical Construction Company v. National Electrical Contractors Association, Inc.*, 814 F.2d 358 (7th Cir.1987), in support of its price fixing argument.

These related cases involved the National Electrical Contractors Association ("NECA"), a trade association for electrical workers. The National Constructors Association and Premier Electrical Construction Company did not belong to NECA and competed with NECA members for contracts. National Constructors and Premier Electrical did not pay NECA dues and service charges, giving them a cost advantage when bidding for projects against NECA members. The International Brotherhood of Electrical Workers ("IBEW") is a labor union representing the majority of electrical workers nationwide. In 1976, NECA entered into a national agreement with the IBEW requiring each employer who entered into a contract with an IBEW member, regardless of whether that party also belonged to NECA, to contribute 1% of its gross labor payroll into an industry fund. The Fourth Circuit found that "[b]y taking the additional 1% of labor costs from non-NECA contractors it robs them of a competitive advantage beneficial to the public.... The industry fund would tend to stabilize the price of electrical construction contracts, a practice illegal per se under the Sherman Act." *Nat'l Elec. Contractors Ass'n*, 678 F.2d at 501. The Seventh Circuit essentially agreed that NECA "used the [IBEW] to increase its rivals' costs of doing business, the better to eliminate a source of competition." *Premier Elec. Constr. Co.*, 814 F.2d at 368. Plaintiff analogizes the OPMs' position to that of NECA and the States' position to that of the IBEW, with the MSA, acting through the Escrow Statutes, as the means by which the two parties allegedly raised rivals' costs.

■ Plaintiff's comparison of the MSA to the NECA cases is inapt for several reasons. As discussed above, the costs about which Plaintiff complains are imposed by the Escrow Statutes, not the agreement between OPMs and the Settling States. Setting that fundamental problem aside, first, the Fourth and Seventh Circuits invalidated the NECA–IBEW contract because the 1% industry fund payment eliminated non-NECA constructors' cost advantage, thereby stabilizing the market price of electrical contracts. Therein was the "pernicious effect on competition" that led to the contract's demise under a price fixing theory. Here, on the other hand, the MSA preserves NPMs' cost advantages. Plaintiff mistakes a price-increasing mechanism for price fixing, but in this case, one proposition does not follow the other. MSA and escrow payments can cause the price of cigarettes to rise, as manufacturers pass on their increased costs to consumers, but those increased prices are not stabilized or fixed in any manner. Instead, as Dr. Gruber has testified and the Second Circuit has found, escrow payments mimic a flat tax that applies across the board to NPMs. *See* Gruber Rep. ¶¶ 13–14, 24; *Freedom Holdings*, 624 F.3d at 56. There is no evidence that NPMs cannot or do not exploit whatever cost advantages they had pre-MSA. Nor is there any evidence that normal market mechanisms are discontinued after the escrow cost is factored into NPM prices. Moreover, NPM escrow payments are on balance lower than OPM and SPM MSA payments, meaning that NPMs still enjoy a cost, and, in turn, a price advantage over their competitors. *See* Gruber Rep. ¶ 24 ("In summary, without the States' escrow statutes, the NPMs would have a substantial marginal cost advantage over both OPMs and SPMs.... [H]owever, even with the escrow statutes, the NPMs have a marginal cost advantage that they would not have had absent the adoption of the MSA and amended escrow statutes together. To be clear, however, the fact that the MSA and escrow statutes impose higher or lower per cigarette costs on different industry participants simply means that they operate like differential taxes, and differential taxes do not in any way promote or dissuade price fixing or other cartel behavior."). The testimony of Grand River, Native Wholesale Supply, and Tobaccoville's executives discloses that the MSA does not restrict them from pricing cigarettes as they choose, and NPMs collectively have exploited this pricing autonomy to gain market share from OPMs and SPMs. The MSA's cost-increasing function, as implemented by the Escrow and Contraband Statutes, lacks the hallmark features of price fixing, and therefore, Plaintiff has not made out a *per se* Sherman Act violation.

■ Second, the NECA cases involved an agreement between private parties. Here, however, the States entered into the MSA, and state legislatures subsequently passed their respective Escrow and Contraband Statutes. Sovereign state acts are *ipso facto* immune from antitrust liability. *Hoover v. Ronwin*, 466 U.S. 558, 568, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984); *Parker v. Brown*, 317 U.S. 341, 351, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Thus, even if the States' participation in the MSA adversely affects competition in the cigarette market, these actions are exempt from the reach of the Sherman Act. *See Freedom Holdings*, 624 F.3d at 59; *Xcaliber Int'l Ltd. v. Attorney Gen. of La.*, 612 F.3d 368, 378–80 & n. 11 (5th Cir.2010); *Grand River Enters. Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 939–41 (8th Cir.2009); *Sanders v. Brown*, 504 F.3d 903, 914–19 (9th Cir.2007).

**2. Preemption of the Escrow and Contraband Statutes**

■ Plaintiff separately argues that the Escrow and Contraband Statutes are

preempted by the Sherman Act. A state law will only be preempted when it presents an "irreconcilable conflict" with federal antitrust law. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982). The test for Sherman Act preemption is two-fold. First, the Court must determine whether the state regulatory scheme "mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute." *Id.* at 661, 102 S.Ct. 3294. The Supreme Court distinguishes between state laws that regulate unilaterally and so-called "hybrid" restraints that grant private parties regulatory control over competition. *See 324 Liquor Corp. v. Duffy*, 479 U.S. 335, 341–43, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987) (striking down New York Alcoholic Beverage law that required New York liquor retailers to participate in a resale price maintenance regime); *Fisher v. City of Berkeley*, 475 U.S. 260, 268–69, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986). A hybrid restraint will similarly be struck down where it "mandates or authorizes" a *per se* violation of the Sherman Act. However, "[a] state regulatory scheme is not preempted by the federal antitrust laws simply because in a hypothetical situation a private party's compliance with the statute might cause [it] to violate the antitrust laws," nor will the court invalidate a state statute "simply because the state scheme might have an anticompetitive effect." *Rice*, 458 U.S. at 659, 102 S.Ct. 3294.

■ The Court must next determine if the *Parker* state action immunity doctrine nonetheless immunizes the state from liability for creating a regulatory scheme which would otherwise constitute a *per se* violation of the Sherman Act. Generally, a statute that permits or compels private parties to engage in *per se* violations of the federal antitrust laws will be saved from preemption if: (1) the restraint in question is "clearly articulated and affirmatively expressed as state policy," and (2) the policy is "actively supervised" by the state itself. *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). State action immunity does not apply where "what appears to be a state- or municipality-administered price stabilization scheme is really a private price-fixing conspiracy, concealed under a 'gauzy cloak of state involvement.'" *Fisher*, 475 U.S. at 269, 106 S.Ct. 1045 (quoting *Midcal*, 445 U.S. at 106, 100 S.Ct. 937).

### a. The Escrow and Contraband Statutes Do Not Mandate or Authorize a Sherman Act Violation

■ Although Plaintiff has only pursued its "raising rivals' costs" theory on summary judgment, the amended complaint also alleges, consistent with *Freedom Holdings*, that the Escrow and Contraband Statutes implement an illegal cartel that restricts output and fixes cigarette prices. Defendants move for summary judgment on these additional preemption theories, urging that the record evidence confirms the Court's previous findings during a preliminary injunction hearing that:

> The MSA does not give OPMs or SPMs any power with respect to the output or prices of their competitors. The MSA does not create disincentives for OPMs, SPMs or NPMs to restrict output or to avoid reducing prices. Finally, there is no evidence to show that the Escrow Statutes enforce or implement OPMs' or SPMs' private market decisions made pursuant to the MSA.

*Grand River*, 2006 WL 1517603, at *9.

The parties' briefs on this point are so garbled as to obscure the actual issue be-

fore the Court—that is, whether the Escrow and Contraband Statutes, on their faces, irreconcilably conflict with the Sherman Act by mandating or authorizing cigarette manufacturers to engage in anticompetitive behavior. *See Rice,* 458 U.S. at 659, 102 S.Ct. 3294. Plaintiff's opposition is entirely focused on a litany of alleged anticompetitive aspects of the MSA, primarily that: (1) the possibility of an NPM Adjustment incentivizes OPMs to raise their prices more than necessary to recoup MSA settlement payments in order to shed market share to NPMs; and (2) special exemptions for grandfathered SPMs incentivize them to restrict output and sell at or below their grandfathered shares. It bears noting that the MSA is not a state statute to be preempted. Thus, the Court need not wade through the parties' extensive arguments about whether or not the MSA creates an output cartel because Plaintiff fails to identify any provision in the Escrow and Contraband Statutes that mandates or authorizes such anticompetitive conduct.[8]

Plaintiff has alleged that the MSA's incentive structure places irresistible pressure on OPMs and SPMs to restrict output and fix prices. This does not explain how the Escrow and Contraband Statutes place irresistible pressure on NPMs to violate the antitrust laws. *See Xcaliber,* 612 F.3d at 375 ("Since [Louisiana's Escrow Statute] does not affect PMs, the only parties potentially facing 'irresistible pressure' from the [Escrow Statute] are NPMs. Although the [Escrow Statute] forces NPMs to charge a higher price for their products to maintain the same level of profitability, it does not pressure them to conspire together to set a specific price, to carve up

markets, or otherwise to violate antitrust law."); *Sanders,* 504 F.3d at 911 ("If NPMs wish to remain profitable, they must factor the escrow payments into the prices they charge per cigarette. [California's Escrow Statute] thus may cause higher prices and dissuade some potential market entrants. Nothing, however, forces the NPMs to either peg their prices to those of participating manufacturers, or to refrain altogether from entering the market."). In *Freedom Holdings,* the plaintiff bridged this gap by alleging that "the severity of the escrow payments established by the challenged statutes coerced NPMs to join the allegedly anticompetitive MSA." 624 F.3d at 54. The *Grand River* Plaintiff has made no such allegations.

Although Plaintiff has not pursued anything resembling the *Freedom Holdings* coercion theory, the Court additionally finds that there is no evidence that the Escrow Statutes conscript NPMs into the MSA. The amended complaint contends only that the Settling States "have discriminated in favor of SPMs and [OPMs] by requiring Grand River to join and make payments under the MSA, or make payments under the Escrow Statutes, in amounts greater than that which Exempt SPMs and other SPMs and the [OPMs] must pay under the MSA." Am. Compl. ¶ 118. The record evidence does not expose such "discrimination." Dr. Gruber calculated the relative costs of compliance with the MSA and Escrow Statutes as follows: in 2007, OPMs paid $5.29953 per carton in MSA settlement payments; SPMs selling in excess of any grandfathered share paid $5.06638; and NPMs paid $5.02138 per carton in escrow costs.

**8.** Therefore, the Court need not decide the parties' countless disputes about which expert used the correct methodology to calculate MSA-related costs, which expert contradicted himself, and so on. As Dr. Eisenstadt's OPM market share "shedding" theory has no bearing on any anticompetitive aspect of the Escrow Statutes, it is irrelevant to Plaintiff's opposition to summary judgment on the Sherman Act preemption claim.

Plaintiff vigorously disputes these findings, arguing that Dr. Gruber computed average costs instead of marginal costs, that some SPMs have higher MSA costs than OPMs, and that grandfathered SPMs selling at or below their grandfathered shares have zero MSA costs. However, these arguments attack the weight of the evidence, which is not an issue for the Court to decide on summary judgment. Plaintiff may quibble with Dr. Gruber's math, but critically it failed to submit evidence of any actual calculations that contradict the overall observation that NPM escrow costs are lower than MSA settlement payments. *Cf. Freedom Holdings,* 624 F.3d at 55–56. Plaintiff has not raised a genuine issue of material fact suggesting that the Escrow Statutes coerce NPMs to join the MSA. Consequently, there is no evidence that the Escrow and Contraband Statutes mandate, authorize, or place irresistible pressure on NPMs to join an illegal output cartel.

Instead, Plaintiff has alleged that the Escrow and Contraband Statutes authorize OPMs and SPMs to violate the Sherman Act by enforcing their alleged regime of supra-competitive cigarette prices. This is a variation on the hybrid restraint theory in *Freedom Holdings.* First, the Court finds that the Escrow and Contraband Statutes are not a hybrid restraint of trade. The statutes do not delegate any degree of private regulatory power to OPMs or SPMs. On their faces, the Escrow Statutes do nothing more than set a per-cigarette payment NPMs must make for each cigarette sold in the state. The Contraband Statutes enforce the Escrow Statutes by requiring NPMs to certify that they are in compliance with state regulations, and, in some cases, by establishing a registry of manufacturers approved to sell cigarettes in-state. Statutory escrow payments are not defined by or tied to OPMs or SPMs. This Court agrees with the

Court of Appeals that the Escrow and Contraband Statutes "are 'unilaterally imposed by government . . . to the exclusion of private control.'" *Freedom Holdings,* 624 F.3d at 53 (quoting *Fisher,* 475 U.S. at 266, 106 S.Ct. 1045) (New York Escrow and Contraband Statute not a hybrid restraint of trade); *see also Xcaliber,* 612 F.3d at 376–77 (allocable share release provision of Louisiana's Escrow Statute not a hybrid restraint of trade); *Grand River Enters. Six Nations, Ltd. v. Beebe,* 574 F.3d at 939 (allocable share release provision of Arkansas' Escrow Statute not a hybrid restraint of trade); *KT & G Corp. v. Attorney Gen. of Okla.,* 535 F.3d 1114, 1130–31 (10th Cir.2008) (allocable share release provision of Kansas' and Oklahoma's Escrow Statutes not a hybrid restraint of trade).

Even if the Escrow and Contraband Statutes were a hybrid restraint, Plaintiff cannot identify any provision in the Escrow and Contraband Statutes themselves that acts to enforce the MSA's alleged output cartel. The only function of the Escrow and Contraband Statutes is to collect from each NPM a per-cigarette fee. These NPM cost increases do not transform the legislation into a free pass for OPMs and SPMs to fix prices. There is no logical explanation as to how a $.0188482 per-cigarette cost (and likely, price) increase allows OPMs and SPMs to set *supra*-competitive prices; NPMs would still be able to gain market share in spite of the cost increase. *See Sanders,* 504 F.3d at 911 ("If the OPMs really are charging artificially high prices, and thus making artificially high profits, an NPM conceivably could compete on price by charging a 'normal' price and still make a 'normal' profit, even taking the escrow payment into account."). It is possible that the Escrow Statutes would allow OPMs and SPMs to follow the NPM

$.0188482 per-cigarette price increase, but this is not evidence of an agreement among manufacturers to fix prices or state authorization to make such an agreement. *See Freedom Holdings,* 624 F.3d at 56 ("There is no doubt that escrow fees were designed to neutralize the cost disadvantage experienced by MSA participants vis-à-vis NPMs. But that is hardly sufficient to demonstrate that the challenged statutes mandate or authorize MSA participants to exercise 'unsupervised private discretion' to fix prices or to penalize gains in market shares. Rather ... the statutes' effort to impose a roughly equivalent cost on NPMs to that borne by manufacturers participating in the MSA can be analogized to the imposition of a flat tax." (citations omitted)). Additionally, evidence of the nature of the cigarette market undermines any suggestion that the Escrow Statutes allow MSA participants to engage in price fixing free from competition from NPMs. The undisputed testimony confirms that Plaintiff and its distributors maintain the ability and discretion to sell as many Grand River cigarettes as possible at any price they chose to set. *See, e.g.,* Leung Decl., Ex. J, Deposition of Larry Phillips at 92–94, 150–52. And, again, the Court notes that NPMs' dramatic increase in market share from 0.4% at the time of the MSA's enactment to 5.4% in 2007 belies Plaintiff's complaints that it can no longer meaningfully compete against MSA participants. Furthermore, the escrow costs "like any cost, will likely be passed on to consumers in the form of higher prices, but where, as here, the state alone imposes the increased cost, there is no private collusion implicating the antitrust laws." *Freedom Holdings,* 624 F.3d at 56; *cf.* Leung Decl., Ex. U, Deposition of David Eisenstadt at 138–39 (Plaintiff's expert's game theory and oligopoly models assume that OPMs unilaterally set their own profit-maximizing prices and do not collude). Thus, it cannot be said that the Escrow and Contraband statutes authorize OPMs and SPMs to engage in price fixing or other cartel behavior, and therefore, the statutes are not preempted. In the end, Plaintiff is really arguing that the Escrow Statutes force NPMs to make escrow payments they do not want to make. The Escrow Statutes may cause NPMs to raise the price of their products to compensate for escrow costs, but this demonstrates, at best, an anticompetitive effect of unilateral state action, not irresistible pressure to violate the Sherman Act.

The foregoing analysis applies equally to Plaintiff's motion for summary judgment. In lieu of the output cartel theory alleged in the amended complaint, Plaintiff argues that the Escrow and Contraband Statutes implement an agreement among competitors to raise rivals' costs constituting illegal *per se* price fixing. Having determined that the Escrow and Contraband Statutes do not create a hybrid restraint of trade and that the increased costs imposed on NPMs (which Plaintiff attributes to the MSA) do not constitute price fixing, it cannot be said that the Escrow and Contraband Statutes mandate or authorize a Sherman Act violation. Therefore, Plaintiff's motion for summary judgment on its preemption claim is denied.

### b. State Action Immunity

■ Additionally, Defendants are entitled to summary judgment on any and all Sherman Act claims on the basis of state action immunity. In *Parker v. Brown,* the Supreme Court clarified that the Sherman Act forbids anticompetitive behavior by private actors, not by the states. 317 U.S. 341, 351, 63 S.Ct. 307, 87 L.Ed. 315 (1943). "If the replacing of entirely free competition with some form of regulation or restraint was not authorized or approved by the State then the rationale of *Parker* is inapposite.... When the conduct is that of

the sovereign itself, on the other hand, the danger of unauthorized restraint of trade does not arise." *Hoover,* 466 U.S. at 568–69, 104 S.Ct. 1989. Thus, "where the action complained of ... was that of the State itself, the action is exempt from antitrust liability regardless of the State's motives in taking the action." *Id.* at 579–80, 104 S.Ct. 1989. *Parker* immunity goes hand in hand with the Court's previous finding that the Escrow and Contraband Statutes are unilateral state action and not a hybrid restraint of trade. Thus, the Defendant States are immune from Sherman Act liability for their entry into the MSA and subsequent passage of the challenged Escrow and Contraband Statutes. *See Freedom Holdings,* 624 F.3d at 59 (agreeing with other circuits that "the MSA and statutes enacted in furtherance of it constitute unilateral state action exempt from the application of the antitrust laws" under *Hoover* ); *see also Xcaliber,* 612 F.3d at 378–80 & n. 11; *Grand River Enters. Six Nations, Ltd. v. Beebe,* 574 F.3d at 939–41; *Sanders,* 504 F.3d at 914–19.

Nevertheless, the Court considers whether the Escrow and Contraband Statutes are saved from preemption on the alternate grounds that any anticompetitive conduct authorized therein is "clearly articulated and affirmatively expressed as state policy" and "actively supervised by the State itself." *Midcal,* 445 U.S. at 105, 100 S.Ct. 937. Plaintiff concedes for the purposes of this summary judgment motion that the Escrow and Contraband Statutes satisfy the first prong of the *Midcal* test—i.e., that the statutes reflect clearly articulated and affirmatively expressed state policy. The issue before the Court is whether the States actively supervise the allegedly anticompetitive conduct.

*Freedom Holdings* is particularly instructive on this point. At the motion to dismiss stage, the Second Circuit found that the *Freedom Holdings* complaint stated adequate facts to foreclose a state action immunity defense. Similar to the case at bar, the *Freedom Holdings* complaint alleged that New York's Contraband Statute protected the MSA's creation of an anticompetitive output cartel; as New York did not monitor or "review the reasonableness" of pricing decisions by the cartel, the Court could not say that the state was legitimately regulating the cigarette industry, as opposed to sanctioning a private price fixing arrangement. *Freedom Holdings,* 357 F.3d at 232 (quoting *Midcal,* 445 U.S. at 106, 100 S.Ct. 937).[9] After a bench trial, however, Judge Hellerstein found that New York satisfied the active supervision requirement for *Parker* immunity because the state exercised "statistical oversight" over MSA and escrow payments. *Freedom Holdings,* 592 F.Supp.2d at 702.

The Second Circuit affirmed Judge Hellerstein's finding, but on slightly different grounds. The Court clarified that "[t]he active supervision required to secure state action immunity necessarily depends on the facts of each case." *Freedom Holdings,* 624 F.3d at 61–62. Where a state statute "effectively allowed one private party to set the prices charged by another private party," state supervision of price schedules was necessary to ensure that the anticompetitive arrangement was a true exercise of state regulatory authority, as opposed to private control. *Id.* at 62. On the other hand, a state statute that imposes a minimum markup on a product can satisfy the active supervision requirement by "structuring a detailed mechanism" for

---

**9.** Based on that opinion, this Court reinstated Grand River's Sherman Act claim. *See Grand* *River,* 2004 WL 1594869, at *2–3.

the price markup. *Id.* at 62 (citing *Morgan v. Div. of Liquor Control*, 664 F.2d 353, 356 (2d Cir.1981)).

> The critical difference then is that, in one case, a private party sets the minimum resale price (without state input or supervision) while, in the other, the state supplants normal market mechanisms only to the extent it mandates the markup. In the latter circumstance, "although the hypothetical statute could eliminate price competition among retailers, that would result from the choice of the state rather than from the choice of the wholesaler. Similarly, the amount of the minimum markup would be determined by the state, not by the wholesaler. . . . Accordingly, there would be nothing to supervise."

*Id.* (quoting 1A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 226e, at 194 (3d ed. 2006)).

Since the Court in *Freedom Holdings* determined that New York's Escrow and Contraband Statutes did not enforce an output cartel engaged in price fixing, New York's alleged failure to monitor cigarette prices was immaterial. Instead:

> [P]laintiffs' antitrust argument reduces to a claim that the challenged statutes, by raising their costs, have the effect of raising cigarette prices. It is undeniably the state, however, that determines the cost increase by fixing the required escrow payments. Thereafter, normal market mechanisms function. . . . Accordingly, because the statute specifies the exact component of the inflated price attributable to the state, "there is nothing that the state can 'actively supervise' except to see that the statutory requirements are obeyed—and there is no claim that the state has neglected this."

*Id.* at 62 (quoting *Battipaglia v. N.Y. State Liquor Auth.*, 745 F.2d 166, 176 (2d Cir. 1984)).

As in *Freedom Holdings*, Plaintiff argues that the States fail to meet the active supervision requirement because they do not monitor cigarette prices to ensure that the Escrow and Contraband Statutes achieve what it describes as the twin goals of the legislation: that is, leveling the playing field between MSA participants and NPMs and increasing NPMs' prices. The States, in turn, point out that because the Escrow and Contraband Statutes do not authorize any cigarette company to agree with another on price, there is no need for the States to supervise cigarette prices in order to receive *Parker* immunity. The States urge that summary judgment in their favor is appropriate because there is no dispute that they track MSA payments through reporting mechanisms and analyses performed by PricewaterhouseCoopers and enforce NPM payments through the Escrow and Contraband Statutes.

As previously discussed, Plaintiff has produced no evidence that the Escrow and Contraband Statutes place irresistible pressure on NPMs to violate the Sherman Act or that they authorize OPMs and SPMs to engage in either an illegal output cartel or an illegal agreement to raise rivals' costs. The States have determined that NPM cigarettes will be \$.0188482 more expensive in part to ensure a source of settlement funds. This cost-increasing function does not determine actual prices charged by any cigarette manufacturer, nor does it implicate price fixing. Therefore, the only aspect of the statutes that require active supervision is the collection of the per-cigarette fee. There is no dispute that the States have actively enforced their Escrow Statutes, so the second prong of the *Midcal* test is satisfied. The States are immune from Sherman Act liability for any anticompetitive conduct authorized by the Escrow and Contraband Statutes.

Plaintiff suggests that the States are not entitled to *Parker* immunity because they act as participants in the cigarette market. The Court of Appeals has rejected the market participant exception to the state action immunity doctrine in antitrust cases. *See Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 79–81 (2d Cir.1998). This Court is bound by that precedent. Moreover, even if the market participant exception were viable in this Circuit, it would not apply to the facts of this case as the States do not manufacture, buy, or sell cigarettes. *See Freedom Holdings,* 624 F.3d at 61 (declining to apply market participant exception where New York regulates cigarette manufacturers but does not engage in the business of manufacturing or distributing cigarettes).

### 3. Rule of Reason

Finally, Plaintiff maintains that the MSA and its implementing legislation violate the Sherman Act under a rule of reason analysis. The Court's determination that the States are immune from liability for their entry into the MSA and for the passage of Escrow and Contraband Statutes under *Hoover v. Ronwin* (or, alternatively, under *Midcal*) precludes the necessity for further Sherman Act inquiry.

### B. Commerce Clause

### 1. Dormant Commerce Clause

■ The Commerce Clause delegates power to regulate commerce among the states to Congress. U.S. Const. art. I, § 8, cl. 3. In so doing, the "dormant" aspect of the Commerce Clause limits state action that impacts interstate commerce. Thus, the dormant Commerce Clause forbids: (1) a state law that clearly discriminates against interstate commerce in favor of intrastate commerce; (2) a nondiscriminatory state law that "imposes a burden on interstate commerce incommensurate with

the local benefits secured;" and (3) a state statute that has the practical effect of controlling commerce occurring entirely outside the state's borders. *Freedom Holdings,* 357 F.3d at 216. The Second Circuit has already affirmed dismissal of Plaintiff's claim that the MSA and its implementing legislation discriminate or burden interstate commerce. *See Grand River,* 425 F.3d at 168–70. The Second Circuit clearly spelled out the Commerce Clause theory on which Plaintiff can proceed as whether "the practical effect of the challenged statutes and the MSA is to control prices outside of the enacting states by tying both the SPM settlement and NPM escrow payments to national market share, which in turn affects interstate pricing decisions." *Id.* at 173.

The Supreme Court's opinions in *Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), and *Healy v. Beer Institute, Inc.,* 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989), guide this Court's resolution of a dormant Commerce Clause claim premised on price control. In *Brown–Forman,* the Court invalidated a New York statute requiring distillers to file a monthly price schedule in which the price charged to New York wholesalers was no more than the price charged to any other wholesaler in the United States. 476 U.S. at 576, 106 S.Ct. 2080. The statute also prohibited distillers from paying promotional allowances because the payments acted as a discount resulting in lower prices to out-of-state wholesalers. *Id.* at 577, 106 S.Ct. 2080. The Court struck down New York's affirmation statute, finding that its "practical effect" was to control prices in other states because "once a distiller's posted price is in effect in New York, it must seek the approval of the New York State Liquor Authority before it may lower its price for the same item in other States." *Id.* at 583,

106 S.Ct. 2080. Furthermore, "[b]y defining the 'effective price' of liquor differently from other States, New York can effectively force appellant to abandon its promotional allowance program in States in which that program is legal, or force those other States to alter their own regulatory schemes in order to permit appellant to lower its New York prices without violating the affirmation laws of those States. Thus New York has 'project[ed] its legislation' into other States, and directly regulated commerce therein." *Id.* at 583–84, 106 S.Ct. 2080.

In *Healy*, the Supreme Court considered a dormant Commerce Clause challenge to a Connecticut statute requiring out-of-state shippers to affirm under oath that their posted prices were no higher than the lowest prices charged in states bordering Connecticut at the time of affirmation. 491 U.S. at 327, 109 S.Ct. 2491. The Court noted that the statute: (1) controlled beer prices in Massachusetts because a brewer's January posting of Massachusetts beer prices would establish a ceiling for the brewer's March prices in Connecticut; (2) controlled beer prices in New York because brewers could offer promotional discounts in New York "only at the cost of locking in the discounted New York price as the ceiling for the Connecticut prices for the full 180 days of the New York promotional discount;" and (3) controlled prices in bordering states which allowed volume discounts because the lowest of the volume-discounted prices would by default set the price in Connecticut. *Id.* at 338–39, 109 S.Ct. 2491. Thus, the Court struck down the statute because its practical effect was that:

> the maximum price in each State would be capped by previous prices in the other States. This maximum price would almost surely be the minimum price as well, since any reduction in either State would permanently lower the ceiling in both. Nor would such "price gridlock" be limited to individual regions. The short-circuiting of normal pricing decisions based on local conditions would be carried to a national scale if a significant group of States enacted contemporaneous affirmation statutes that linked instate prices to the lowest price in any State in the country. This kind of potential regional and even national regulation of the pricing mechanism for goods is reserved by the Commerce Clause to the Federal Government and may not be accomplished piecemeal through the extraterritorial reach of individual state statutes.

*Id.* at 340, 109 S.Ct. 2491.

The Second Circuit's recent opinion in *Freedom Holdings* is particularly relevant to this analysis. After the Court of Appeals reinstated the dormant Commerce Clause claim in this case, the *Freedom Holdings* plaintiff amended its complaint to add an identical price control challenge to New York's Escrow and Contraband Statutes. *Freedom Holdings*, 624 F.3d at 64. In affirming Judge Hellerstein's dismissal of the *Freedom Holdings* dormant Commerce Clause challenge, the Court of Appeals found that there was no evidence that New York's statutes cause *Brown–Forman* or *Healy* price gridlock as manufacturers are free to recoup the cost of complying with New York's escrow statutes by raising cigarette prices in New York, and nothing in New York's Escrow Statute required a manufacturer to obtain another state's approval for that price increase. *Id.* at 66. Significantly, the Court of Appeals noted that "[i]n *Grand River*, however, we suggested that a factfinder might be able to infer control from the fact that the allocable share release provision, which refunds payments made by NPMs in excess of what they would have paid as SPMs under the MSA, might effectively

require NPMs to pay a 'national-market-share-dependent amount.'" *Id.* at 67. However, in light of the fact that MSA payments exceed escrow payments, New York's amended allocable share release provision had never been applied, and therefore "the district court was hardly compelled to conclude that NPM escrow payments will actually be released from the state escrow fund in amounts calculated by reference to national market share." *Id.* In the end, the Court of Appeals found that *Freedom Holdings'* dormant Commerce Clause challenge amounted to little more than allegations of an unobjectionable upstream pricing impact. *Id.*

### a. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the dormant Commerce Clause claim on two grounds. First, the States argue that their Escrow Statutes do not operate extraterritorially because they apply solely to an NPM's in-state sales; therefore, nothing in the Escrow Statutes creates an inference of price control. The Court considers New York's Escrow Statute as a representative example of the state statutes at issue (excepting Missouri's, which is addressed separately below). New York requires an NPM to place into escrow $.0188482 per unit sold. N.Y. Pub. Health Law § 1399–pp. "'Units sold' means the number of individual cigarettes sold *in the state* by the applicable tobacco product manufacturer (whether directly or through a distributor, retailer or similar intermediary or intermediaries) during the year in question, as measured by excise taxes collected by the state on packs bearing the excise tax stamp of the state." *Id.* § 1399–*oo*(10) (emphasis added). By definition, the escrow obligation is based on an NPM's in-state cigarette sales, if any; an NPM's out-of-state and nationwide sales have no

effect on its initial escrow payment, before any allocable share release. *Cf. Grand River Enters. Six Nations, Ltd. v. Beebe,* 574 F.3d at 944 ("[T]he Allocable Share Amendment at issue here is not based on cigarette sales outside of Arkansas. NPM escrow payments are entirely a function of an NPM's sales in Arkansas. The payments are not based on nationwide sales."); *Star Scientific, Inc. v. Beales,* 278 F.3d 339, 356 (4th Cir.2002) ("Thus, rather than regulate 'upstream transactions' outside of the State, the Virginia [escrow] statute imposes a fee only for cigarettes actually sold within the State. It has no effect on transactions undertaken by out-of-state distributors in other States.").

The Second Circuit previously accepted Plaintiff's allegation that the allocable share release provisions might require an NPM to pay a "national-market-share-dependent amount." However, the record evidence does not bear out this contention. Under New York's Escrow Statute, for example, an NPM is entitled to a refund of any escrow payments "on account of units sold" in New York exceeding "the master settlement agreement payments ... that such manufacturer would have been required to make on account of such units sold had it been a participating manufacturer." N.Y. Pub. Health Law § 1399–pp(2)(b)(ii). In other words, an NPM's escrow payments are capped by its theoretical MSA payments if it joined the MSA as a non-grandfathered SPM. It is true that the calculation of the theoretical MSA payment does take into account a manufacturer's nationwide sales. However, the undisputed evidence in the record shows that non-grandfathered SPM payments under the MSA (the amount an NPM would pay if it joined the MSA today) are greater than NPM escrow payments. Since there is no evidence that an NPM's escrow payments have exceeded or will exceed the cap, there is no refund under

the amended allocable share release provision. This means that an NPM's actual net escrow payment is simply the number of cigarettes sold in-state times $.0188482, an amount that is in no way tied to a national-market-share-dependent MSA payment. In reality, an NPM's escrow payments are determined solely on the basis of in-state sales, and therefore, there is nothing in the Escrow Statutes from which the Court can infer extraterritorial price control.

Plaintiff's evidence is not to the contrary. First, Plaintiff points to Dr. Bulow's opinion that

> The requirements of the MSA and its legislation operate "extraterritorially" in that they create a regulatory payment scheme in each Settling State that uses national-market-share-dependent formulas to derive regulatory payments due each State. That is, the regulatory scheme in each Settling State is not tied to commercial activity in that State but, rather, commercial activity nationwide, *i.e.*, the *national* market shares and *sales volume of the respective tobacco product manufacturers being regulated.*

(Bulow Rep. at 2) (emphasis in original). But this is nothing more than a recitation of the "possible" claim recognized by the Second Circuit in an expert's words. Dr. Bulow provides no supporting data from which the Court can conclude that any NPM has in fact received an escrow refund under an amended allocable share release provision based on its nationwide cigarette sales. Moreover, Plaintiff conveniently dissects the expert's conclusion from his supporting analysis, which actually concerns OPM and SPM MSA payments, not escrow payments by NPMs. Dr. Bulow opines that the MSA operates extraterritorially not because of the allocable share release provision in the Escrow Statutes, but because "the MSA requires a

payment to be made to California based on a quantity of cigarettes manufactured in Virginia and sold in Tennessee" and because there is no defined relationship between a state's per capita cigarette sales and its allocable share of MSA payments. (*Id.* at 7). Dr. Bulow's analysis does not respond to Defendants' summary judgment argument, and therefore does not create an issue of material fact.

Plaintiff additionally cites two 2003 documents authored by the National Association of Attorneys General ("NAAG") urging the Settling States to amend the allocable share provision in their Escrow Statutes. Nothing in these documents indicates that any one state controls prices in another; instead, NAAG is simply pointing out that passing and enforcing escrow legislation is in each state's best interest because it ensures the existence of a settlement fund from with the state can be reimbursed for health care costs. The documents do not concern pricing at all.

█ In the end, even if the Escrow Statutes' indirect reference to national market share could implicate the dormant Commerce Clause, there is no evidence that their practical effect is to control prices by linking escrow payments to out-of-state sales. This finding confirms the Second Circuit's ruling in *Freedom Holdings*, 624 F.3d at 67, as well as one by the district court in Kansas, which rejected a similar Commerce Clause challenge to Kansas' Escrow Statute on summary judgment:

> Thus, contrary to what the Second Circuit posed as a "possibility" in *Grand River*, the amount which an NPM is required to pay into escrow in Kansas—or any other Settling State with a similar statute—is in no way "keyed" to a "national-market-share dependent amount." Instead, it is keyed to the

MSA payment which an SPM would have been required to make on account of the cigarettes sold in Kansas. The base SPM per-cigarette payment is always higher than the statutory per-cigarette escrow amount for NPMs. Therefore, absent some adjustment which reduces the payment amount below the SPM base amount, the NPM escrow obligation in Kansas is determined solely on the basis of the payment amount set forth in the Escrow Statute, multiplied by the number of cigarettes which the NPM sells in Kansas. What takes place in other states has no bearing on this calculation.

*Int'l Tobacco Partners, Ltd. v. Kline,* 475 F.Supp.2d 1078, 1090–91 (D.Kan.2007).

Second, the States move for summary judgment because there is no direct evidence that the Escrow Statutes cause the "short circuiting of normal pricing decisions" discussed in *Healy.* Nothing in one state's Escrow Statute creates a floor or ceiling for the price an NPM can charge in another state. The undisputed deposition testimony in this case shows that Grand River and its distributors retain pricing authority; neither state legislation nor competitor price changes affect Grand River's pricing decisions. Indeed, Tobaccoville can sell Seneca brand cigarettes at a loss to build market share in Tennessee without having to lower its price in Georgia or North Carolina. Similarly, nothing in any of the Escrow Statutes prevents an NPM from raising its prices in a given state to cover escrow payments imposed by that state's legislation. *See Freedom Holdings,* 624 F.3d at 66 ("Unlike the statute struck down in *Healy,* however, nothing prevents manufacturers from recouping increased costs imposed by New York laws from New York consumers.").

Plaintiff seems to be arguing that the imposition of identical per-cigarette escrow costs in the forty-six Settling States promotes regulatory gridlock. It again cites to Dr. Bulow, who opines that the States require "per carton payments that are exactly the same, because the purpose is to protect an extraterritorial set of payments or taxes." (Bulow Rep. at 17). As an initial matter, Plaintiff does not identify any provision in the Escrow Statutes requiring an NPM to obtain one state's regulatory approval before selling in another state. Dr. Bulow's speculation about the States' motivation in passing their Escrow Statutes is little more than *ipse dixit,* and, moreover, does not raise a genuine issue of material fact with respect to *price control,* which is the basis of this dormant Commerce Clause claim. To be sure, New York and North Carolina's Escrow Statutes, for example, make each cigarette sold in-state $.0188482 more expensive, but it does not follow that New York sets the price of cigarettes sold in North Carolina. As the Second Circuit noted in *Freedom Holdings,* interstate price control "is not evidenced simply by coincident obligations which may produce parallel prices increases among the states." 624 F.3d at 67. A careful review of the record evidence reveals that the Escrow Statutes do not operate extraterritorially, and even if, as the Circuit recognized, the amount of an escrow refund is keyed to the amount an NPM would have paid if it joined the MSA as an SPM, a national-market-share-dependent amount, Defendants have shown that this scheme does not result in interstate price control. Defendants' motion for summary judgment on the dormant Commerce Clause claim is granted.

### b. Plaintiff's Motion for Summary Judgment

On appeal, the Second Circuit found that Plaintiff had stated a possible Commerce Clause claim based on the allegation that "the practical effect of the challenged stat-

utes and the MSA is to control prices outside of the enacting states by tying both the SPM settlement and NPM escrow payments to national market share, which in turn affects interstate pricing decisions." *Grand River*, 425 F.3d at 173. Plaintiff advances two arguments in support of its cross motion for summary judgment on the Commerce Clause claim: (1) a veto provision in the MSA allows a single Settling State to determine whether an NPM can become an SPM, thereby regulating commerce in any state that would allow the NPM to join; and (2) Missouri's Escrow Statute imposes escrow obligations based on commerce that takes place in other states. It is questionable whether either of these theories advances the price control claim the Second Circuit remanded, but the Court will address them in turn.

### i. Veto Power

■ Plaintiff filed an amended complaint to amplify its remaining Sherman Act and Commerce Clause claims on March 27, 2008. The amended complaint pleads no facts establishing any state's ability to veto an NPM's MSA application, nor does the complaint reference any provision in the MSA setting forth such power. Instead, Plaintiff now raises a Commerce Clause challenge to the MSA based on information gleaned from a May 13, 2008 deposition of the director and chief counsel of NAAG's Tobacco Project. Specifically, Peter Levin of NAAG testified that after reviewing an NPM's MSA application, the Settling States will "collectively" decide whether or not they wish to settle with the NPM. (Violi Decl., Ex. H, Deposition of Peter J. Levin at 180). From this single piece of testimony, Plaintiff extrapolates a dormant Commerce Clause claim, namely that by allowing one state to veto an NPM's entry into the MSA, that state is regulating commerce in

the other forty-five Settling States by forcing the manufacturer to sell as an NPM instead of an SPM.

First and foremost, there were no facts supporting this veto power claim pleaded in the complaint, and therefore, it is not properly raised on summary judgment. Post-remand by the Second Circuit, the only possible dormant Commerce Clause challenge to the MSA (if any challenge to the MSA separate and apart from the Escrow Statutes survived at all) is that the MSA controls prices outside of a Settling State by tying SPM settlement payments to national market share. *See Grand River*, 425 F.3d at 173. Plaintiff has apparently abandoned that price control claim.

Even if the veto power were well-pleaded, Plaintiff has not adduced any evidence in support of its motion for summary judgment. There is no evidence that any Settling State has attempted or has successfully vetoed an NPM's entry into the MSA. Grand River's own MSA application was rejected due to its unwillingness to comply with the MSA's terms, specifically Section XVIII(1). *See Grand River*, 2006 WL 1517603, at *7. Furthermore, there is no evidence that this hypothetical veto power has any affect on commerce in the Settling States. If, for example, every Settling State except New York wanted to settle with an NPM but New York blocked its entry into the MSA, the manufacturer could simply continue selling in any Settling State, with lower costs and likely at a lower price, as an NPM. There is certainly no evidence that the necessity of collective agreement among the States to settle impermissibly affects commerce, much less cigarette prices, at all.

### ii. Missouri's Escrow Statute

■ Missouri is the only state that has not amended the allocable share release provision of its Escrow Statute. In Missouri, an NPM is entitled to a refund of

any escrow payments made in excess of Missouri's "allocable share of the total payments that such manufacturer would have been required to make in that year under the Master Settlement Agreement ... had it been a participating manufacturer." Mo. Ann. Stat. § 196.1003(b)(2)(B). Plaintiff offers the following hypothetical to illustrate the extraterritorial reach of Missouri's Escrow Statute: if an SPM's MSA payment is $5 per carton of cigarettes and Missouri's allocable share of MSA payments is 1%, then an NPM selling 10,000 cartons only in Missouri would be entitled to a refund of any escrow payments over $500; however, if the NPM sold 10,000 cartons in Missouri and 10,000 cartons in New York, it would only be entitled to a refund of Missouri escrow payments over $1,000. Therefore, Plaintiff argues that an NPM selling in Missouri [10] and another Settling State is required to make additional escrow deposits in Missouri based on out-of-state sales.

Missouri's allocable share release provision provides an NPM with the ability to obtain an escrow refund that is likely impossible in every other Settling State. Despite the fact that Missouri's escrow requirements are in part keyed to national sales, an NPM's escrow obligation in Missouri is substantially less than in the other Settling States. Thus, any effect on cigarette prices caused by Missouri's allocable share release would inure to the NPM's benefit; it is quite a leap to infer that Missouri's Escrow Statute leads to interstate price control. Plaintiff itself has argued that the Escrow Statutes as originally enacted (such as Missouri's current Escrow Statute) allowed it to "offer meaningful price competition to Participating Manufacturers that had joined the

MSA"—even grandfathered SPMs. Leung Decl., Ex. C, Plaintiff's Proposed Findings of Fact in Support of Temporary Restraining Order and Preliminary Injunction, at ¶ 26. In fact, all of the record evidence indicates that NPMs incur lower escrow costs in Missouri than they do in other Settling States, and escrow significantly less than OPMs and SPMs pay in MSA settlement costs. The reduction in costs afforded by Missouri's allocable share release provision creates an opportunity for price competition as opposed to price control.

There is no evidence that the practical effect of either the MSA veto provision or Missouri's Escrow Statute is to control interstate cigarette prices. Plaintiff's motion for summary judgment on its dormant Commerce Claim is denied.

### 2. Foreign Commerce Clause

Finally, Plaintiff moves for summary judgment on its Commerce Clause claim on the grounds that the Escrow Statutes regulate Canadian commerce. State regulation or taxation of an activity that has "a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State," does not burden interstate commerce in violation of the Commerce Clause. *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). However, "an inquiry more elaborate than that mandated by *Complete Auto* is necessary when a State seeks to tax the instrumentalities of foreign, rather than of interstate, commerce. In addition to answering the nexus, apportionment, and nondiscrimination questions posed in *Complete Auto,* the court must also inquire, first, whether the tax, not-

---

**10.** There is no evidence that Grand River or its distributors has ever sold any Grand River cigarettes in Missouri.

withstanding apportionment, creates a substantial risk of international multiple taxation, and, second, whether the tax prevents the Federal Government from 'speaking with one voice when regulating commercial relations with foreign governments.'" *Japan Line, Ltd. v. Los Angeles County,* 441 U.S. 434, 451, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979). In its motion for summary judgment, Plaintiff makes two separate but related arguments that the Court refers to as the Foreign Commerce Claim. First, Plaintiff argues that it is a Canadian company that conducts no business in, and therefore lacks a substantial nexus to, the United States as required by *Complete Auto* and *Japan Line.* Second, Plaintiff contends that the Escrow Statutes impermissibly regulate foreign commerce by requiring Grand River to make per-cigarette escrow payments based on Seneca brand cigarettes that are sold instate by third party importers/distributors, as the sale of cigarettes from Grand River to its distributors takes place in Canada.

Plaintiff previously argued that the Escrow Statutes violated the Foreign Commerce Clause because their regulation of Grand River, a Canadian company, is inconsistent with a trade initiative between the United States and Colombia that removes duties on tobacco imports in exchange for replacing coca crops with tobacco crops. This Court dismissed the Foreign Commerce Clause challenge pursuant to Rule 12(b)(6), *see Grand River,* 2003 WL 22232974, at *12, and entered final judgment on the claim. *Grand River,* 2004 WL 2480433, at *3.

On appeal, Plaintiff abandoned the Colombian trade initiative argument in favor of the exact argument it now attempts to revive. Specifically, Plaintiff contended:

> Independent of [the claim that the Escrow Statutes tie payments to national market shares], an Escrow Statute di-

rectly regulates commerce occurring entirely outside the enacting State's borders because it applies to an NPM even if the NPM conducts no business nor effects any sale in the subject State. Specifically, Grand River sells no products within the jurisdiction of any MSA State. Indeed, no matter where (be it in Canada or overseas) or to whom Grand River sells its products, it is assessed under an Escrow Statute if it "intends" that the products be sold "in the United States" and the products are subsequently sold in an MSA State—even by independent entities with which Grand River has had no dealings. Defendants' enforcement and application of the Escrow Statutes to Grand River simply because its products are sold in an MSA State constitutes an impermissible, extraterritorial reach and application of the Escrow Statute to out-of-state entities and transactions. *Quill Corp. v. North Dakota,* 504 U.S. 298, 311 [112 S.Ct. 1904, 119 L.Ed.2d 91] (1992) (State's taxation of supplier whose only nexus with State is mail order sales violates Commerce Clause; mail order sales do not constitute sufficient nexus with State to sustain regulation or taxation of out-of-state sellers).

(Leung Decl. Ex. B, Brief of Plaintiff-Appellant at 42–43, *Grand River Enterprises Six Nations, Ltd. v. Pryor,* 425 F.3d 158 (2d Cir.2005) (No. 03–9179)). The Court of Appeals did not explicitly address the foreign commerce aspect of the Commerce Clause claim in its opinion, but unambiguously concluded that "[w]e have carefully considered appellants' other arguments and find them to be without merit." *Grand River,* 425 F.3d at 175.

Following remand, this Court granted Plaintiff's Rule 15(a) motion to amend the complaint "to the extent the proposed amendments relate to its surviving Sher-

man Act and Commerce Clause claims." *Grand River Enters. Six Nations v. Pryor,* No. 02 Civ. 5068, slip op. at 1 (S.D.N.Y. Mar. 17, 2008). The opinion made clear that no amendment relating to theories of liability dismissed by the Court of Appeals would be allowed. The Court of Appeals, in turn, made clear that the only surviving basis of the Commerce Clause claim was that "the practical effect of the challenged statutes and the MSA is to control prices outside of the enacting states by tying both the SPM settlement and NPM escrow payments to national market share, which in turn affects interstate pricing decisions." *Grand River,* 425 F.3d at 173. Having failed to persuade the Court of Appeals of the merit of this argument, any attempt by Plaintiff to replead a claim premised on the regulation of Canadian commerce was improper; consequently, there is no Foreign Commerce Clause claim for the Court's consideration on this motion.

### C. Collateral Estoppel

For unspecified reasons, Plaintiff has separately pursued Sherman Act and Commerce Clause challenges to the MSA and Escrow Statute against the Arkansas Attorney General in the Western District of Arkansas. The district court dismissed all of Plaintiff's claims, and the Eighth Circuit affirmed. *See Grand River Enters. Six Nations, Ltd. v. Beebe,* 418 F.Supp.2d 1082 (W.D.Ark.2006), *aff'd,* 574 F.3d 929 (8th Cir.2009). The Defendant States argue that the doctrine of collateral estoppel bars Plaintiff from pursuing identical claims in Arkansas and New York. Having independently determined that Defendants are entitled to summary judgment on both the Sherman Act and Commerce Clause claims, the Court need not decide whether the Eighth Circuit's dismissal of identical challenges to the MSA and Arkansas' Escrow and Contraband

Statutes precludes Plaintiff's claims in this action.

### IV. Conclusion

To the extent resolution of the evidentiary motions is required, the motion to exclude Dr. Eisenstadt's and Dr. Bulow's expert reports is denied. Having reviewed all of the evidence proffered in support of its claims, the Court holds that Plaintiff's motion for summary judgment on the Commerce Clause and Sherman Act claims is denied in all respects. The States' motion for summary judgment on the Commerce Clause and Sherman Act preemption claims is granted. Any and all Sherman Act violation claims are foreclosed on the basis of state action immunity.

Decision on these motions (Docket Nos. 305 and 306) resolves all of the claims in the amended complaint. The Clerk of Court is directed to close this case.

**SO ORDERED.**