Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp., 2018 NCBC 136.

STATE OF NORTH CAROLINA

DAVIE COUNTY

KERRY BODENHAMER FARMS, LLC,

  Plaintiff,

v.

NATURE'S PEARL CORPORATION,

  Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 217

**ORDER AND OPINION
ON MOTIONS IN LIMINE**

1. This case is scheduled for trial on January 28, 2019. In this Order, the Court must decide whether to exclude certain opinions offered by each party's expert witness.

> *Wyche, P.A., by Wade S. Kolb, III, Matthew T. Richardson, and Eric B. Amstutz, and Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Kearns Davis, Eric M. David, and Jessica Thaller-Moran, for Plaintiff Kerry Bodenhamer Farms, LLC.*
>
> *Nelson Mullins Riley & Scarborough, LLP, by G. Gray Wilson and Lorin J. Lapidus, for Defendant Nature's Pearl Corporation.*

Conrad, Judge.

I.
BACKGROUND

2. Earlier opinions describe in detail the nature of this case and its procedural history. *See Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2018 NCBC LEXIS 84 (N.C. Super. Ct. Aug. 15, 2018); *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2017 NCBC LEXIS 27 (N.C. Super. Ct. Mar. 27, 2017). Thus, the Court provides only a short summary here in lieu of a detailed background.

3. This action arises out of a contract dispute. Defendant Nature's Pearl Corporation sells juices and related products that require muscadine grapes. Plaintiff Kerry Bodenhamer Farms, LLC ("KB Farms") is one of its grape suppliers. In January 2012, Nature's Pearl and KB Farms executed a written contract in which Nature's Pearl obtained the exclusive right to purchase all of KB Farms's grapes on an annual basis for twenty years. As it turns out, the contract lasted just three. The flashpoint was a single load of grapes delivered in September 2014. After pressing the grapes, Nature's Pearl tested the alcohol content of the juice and determined that it was too high. Nature's Pearl refused to pay for the load and, several months later, terminated the contract. KB Farms argues that there was nothing wrong with the grapes and that, having accepted them, Nature's Pearl's termination was without cause. Each party now accuses the other of breaching the contract.

4. One key issue in this case is whether the September 2014 shipment was fermented at the time of delivery. Nature's Pearl contends that it was and intends to offer Dr. Reza Ghaedian as an expert witness in support of that position. Ghaedian will opine that the likely cause of fermentation was a two-day delay between the time that KB Farms picked the grapes and the time that it shipped them. (Br. in Supp. of Pl.'s Mot. Lim. 2, ECF No. 92.1 ["Pl.'s Br. in Supp."].) Ghaedian will also testify that the Brix level, or sugar content, of the grapes was not the cause of the alcohol content and that it would not have been feasible for Nature's Pearl to test the alcohol content of the grapes before pressing them into juice. (Pl.'s Br. in Supp. 2.)*

---

* In its notice designating Ghaedian as an expert witness, Nature's Pearl listed five opinions that he was expected to offer. After KB Farms filed its motion in limine, Nature's Pearl

5. KB Farms contends that the grapes were not fermented at the time of delivery. It has pointed to evidence intended to show that Nature's Pearl combined the juice from the September 2014 shipment with juice from other growers before testing it, thus compromising the test results. KB Farms also expects to call Dr. Barclay Poling as an expert witness to testify that any fermentation in the disputed shipment likely occurred after delivery and during processing by Nature's Pearl. (*See* Br. in Supp. of Def.'s Mot. Lim. 5, ECF No. 91 ["Def.'s Br. in Supp."].)

6. Poling is also the damages expert for KB Farms. He opines that KB Farms suffered lost profits of roughly $150,000 to $200,000 when Nature's Pearl refused to accept the 2015 harvest after terminating the contract. (*See* Def.'s Br. in Supp. Ex. 1 at 14 ["Poling Report"].) He also concludes that KB Farms will suffer future lost profits of more than $1.7 million through 2031, the end of the contract's 20-year term. (*See* Poling Report 14–15.) These opinions are set out in a sixteen-page report.

7. Each party has filed a motion in limine, seeking to exclude the testimony of the other's expert. (*See* ECF Nos. 90, 92.) The Court held a hearing on December 13, 2018, and the motions are ripe for disposition.

## II.
## LEGAL STANDARD

8. "A motion *in limine* seeks pretrial determination of the admissibility of evidence to be introduced at trial." *State v. Britt*, 217 N.C. App. 309, 313, 718 S.E.2d

---

withdrew two of the five. (*See* Def.'s Notice of Withdrawal Certain Exp. Op., ECF No. 95 (withdrawing Ghaedian's testimony that (1) Nature's Pearl had the right to and timely did reject the grapes, and also had the right to cancel the contract; and (2) KB Farms's grape shipment had "excessive alcohol content")).

725, 728 (2011). "The trial court has wide discretion in making this advance ruling and will not be reversed absent an abuse of discretion." *Hamilton v. Thomasville Med. Assocs.*, 187 N.C. App. 789, 792, 654 S.E.2d 708, 710 (2007) (quoting *Heatherly v. Indus. Health Council*, 130 N.C. App. 616, 619, 504 S.E.2d 102, 105 (1998)). Furthermore, "[t]he Court's ruling on motions *in limine* is interlocutory and 'subject to modification during the course of the trial.'" *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2017 NCBC LEXIS 91, at *6 (N.C. Super. Ct. Oct. 3, 2017) (quoting *Hamilton*, 187 N.C. App. at 792, 654 S.E.2d at 710).

9. "Expert testimony is governed by North Carolina Rule of Evidence 702, which is now virtually identical to its federal counterpart and follows the *Daubert* standard for admitting expert testimony." *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2017 NCBC LEXIS 14, at *39–40 (N.C. Super. Ct. Feb. 24, 2017) (internal citations and quotation marks omitted). In other words, North Carolina trial courts now perform the same "gatekeeping role" that federal district courts have long performed. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). In applying Rule 702, the Court may look to federal decisions as persuasive authority. *See Insight Health Corp.*, 2017 NCBC LEXIS 14, at *40.

10. Rule 702(a) sets out a three-part test. First, the "expert testimony must be based on specialized knowledge that will assist the trier of fact." *Id.* at *39. Second, the expert must be qualified through some combination of appropriate education and experience. *See id.* Third, the expert's testimony must be reliable, meaning that it is "based upon sufficient facts or data," is "the product of reliable principles and

methods," and applies these "principles and methods reliably to the facts of the case." *Id.* at *39–40 (quoting N.C. R. Evid. 702(a)(1)–(3)). "The precise nature of the reliability inquiry will vary from case to case depending on the nature of the proposed testimony," and "the trial court has discretion in determining how to address the three prongs of the reliability test." *State v. McGrady*, 368 N.C. 880, 890, 787 S.E.2d 1, 9 (2016).

## III.
## PLAINTIFF'S MOTION

11. KB Farms asks the Court to disqualify Ghaedian on the grounds that he lacks appropriate education and experience. (*See* Pl.'s Br. in Supp. 2, 3, 4.) It also argues that his opinions are not based on sufficient facts and data and are therefore unreliable. (*See* Pl.'s Br. in Supp. 4, 10.)

12. The requirement that an expert must be qualified has been "liberally construed." *United States v. Velasquez*, 64 F.3d 844, 849 (3d Cir. 1995). "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009); *see also Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996) ("[M]ost arguments about an expert's qualifications relate more to the weight to be given the expert's testimony, than to its admissibility."). Such is the case here.

13. Ghaedian holds a Ph.D. in food science and technology. (Def.'s Designation of Exp. 4, ECF No. 60 ["Def.'s Designation"]; *see also* Br. in Opp'n to Pl.'s Mot. Lim. 3, ECF No. 94 ["Def.'s Opp'n"].) His master's thesis related to "muscadine grape juice components and properties." (Def.'s Designation 6.) And he served, for a short time,

as a quality assurance manager at a processing facility for muscadine grapes. (*See* Def.'s Designation 6, 7.) This combination of education and practical experience, however brief, is sufficient to qualify Ghaedian as an expert on factors that contribute to fermentation in muscadine grapes.

14. KB Farms argues that Ghaedian's experience is stale because his work with muscadine grapes dates to the early 1990s. (*See* Pl.'s Br. in Supp. 3.) This is a fair subject for cross-examination, but it is not disqualifying. KB Farms has not shown that Ghaedian's knowledge is too old to be useful to the jury, especially given that he has remained active in related areas (including other fruits, such as cranberries). *See, e.g.*, *Antioch Co. Litig. Trust v. McDermott Will & Emery, LLP*, 2016 U.S. Dist. LEXIS 114022, at *7 (S.D. Ohio Aug. 25, 2016) (holding that "the fact that [expert] has not practiced in 23 years" was subject of cross-examination but not disqualifying); *see also Am. Auto. Ins. Co. v. First Mercury Ins. Co.*, 2017 U.S. Dist. LEXIS 163346, at *15–16 (D.N.M. Sept. 30, 2017); *Ryan v. Nat'l Union Fire Ins. Co.*, 2010 U.S. Dist. LEXIS 53910, at *8–9 (D. Conn. June 2, 2010); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 479 (S.D.N.Y. 2010); *Owens v. Amtrol, Inc.*, 94 F. Supp. 2d 952, 955 (N.D. Ind. 2000).

15. As to reliability, KB Farms argues that Ghaedian made only a cursory investigation. (*See* Pl.'s Br. in Supp. 4, 5.) Ghaedian depended primarily on information gathered from Achan Smith, a Nature's Pearl employee who was present at the time the grapes were received and processed. Ghaedian did not visit Nature's Pearl's processing facility, and during his deposition, he was unfamiliar with some of

Nature's Pearl's processes, could not confirm that the sampled grapes all came from the same grower, and did not review available production records. (*See* Pl.'s Br. in Supp. 5, 11–12.)

16.    By and large, though, Ghaedian's anticipated testimony is rooted in generally accepted scientific principles of fermentation, which do not require investigation of Nature's Pearl's facility. Both parties' experts agree that muscadine grapes ripen and mature at different rates in the vineyard and that the Brix level cannot be the sole cause of excessive alcohol in muscadine grapes. It is also agreed that a delay between harvesting and delivering grapes enhances the natural fermentation process. Ghaedian's understanding of these general principles does not turn on the particular facts of this case, and the Court sees no reason that his limited investigation should prevent him from testifying about relevant general scientific principles. *See Strauss Farms, Inc. v. Combs Commodities, Inc.*, 2005 U.S. Dist. LEXIS 6965, at *5–7 (D. Kan. Mar. 29, 2005) (allowing expert to testify as to general principles not based on facts or data specifically related to the case).

17.    This includes Ghaedian's opinion that it would not have been feasible to test the alcohol content of the grapes until after they were pressed into juice. Ghaedian does not base this opinion on unique circumstances related to the disputed shipment. Rather, he opines that it is generally true that grapes must be processed to obtain an accurate sample. KB Farms disagrees with this view but has not pointed to any basis to exclude it as unreliable.

18.     The quality of Ghaedian's investigation appears to be relevant only to his opinion that the most likely cause of the excessive alcohol content was a two-day delay between the time that KB Farms picked the grapes and the time that it shipped them. In forming that opinion, Ghaedian relied almost exclusively on information from Achan Smith, who reported that the Nature's Pearl employees present at the time of delivery had (1) collectively sensed that the grapes were fermented, based on a sufficient sampling procedure, and (2) run their operations normally. Taking the facts given to him as true, Ghaedian concludes that the fermentation occurred before delivery, likely as a result of the shipping delay.

19.     Although KB Farms argues that Ghaedian should have performed a more thorough and independent investigation, our Court of Appeals has held that "experts may rely on data and other information supplied by third parties even if the data were prepared for litigation by an interested party." *Pope v. Bridge Broom, Inc.,* 240 N.C. App. 365, 374, 770 S.E.2d 702, 710 (2015) (internal citation, alteration, and quotation marks omitted). It is also reasonable for an expert to make "assumptions so long as those assumptions are sufficiently grounded in available facts." *Edison Wetlands Ass'n v. Akzo Nobel Chems., Inc.*, 2009 U.S. Dist. LEXIS 119281, at *13 (D.N.J. Dec. 22, 2009). Arguments that the expert's assumptions are unfounded typically "go to the weight, not the admissibility, of the testimony." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 180914, at *117 (E.D.N.Y. Oct. 15, 2014) (quoting *Grand River Enters. Six Nations, Ltd. v. King*, 783 F. Supp. 2d 516, 526 (S.D.N.Y. 2011)).

20. Here, it appears to be undisputed that KB Farms shipped the disputed grapes two days after picking them, and Achan Smith's testimony supports Ghaedian's assumption that there were no unusual processing delays at Nature's Pearl's facility after delivery. Ghaedian's assumptions are therefore sufficiently grounded in available facts. Whether the assumptions are *correct* is not a question the Court can or should resolve. To the extent KB Farms disagrees with Ghaedian's assumptions, it is free to cross-examine him about them and also the scope and substance of his investigation. "A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).

21. Accordingly, the Court concludes that Ghaedian is qualified to testify as an expert in this area and that his testimony is sufficiently reliable to satisfy Rule 702. The Court denies Plaintiff's motion to exclude his testimony.

## IV.
## DEFENDANT'S MOTION

22. Nature's Pearl seeks to exclude Poling's testimony as to the likely cause of fermentation in the September 2014 shipment and as to the lost profits incurred by KB Farms after the termination of the parties' contract. The Court considers each in turn.

### A. Causation

23. Nature's Pearl argues that Poling is not qualified to testify in the area of fermentation and that, even if he is, his opinion on the likely cause of fermentation is

unreliable. (*See* Def.'s Br. 1–2, 5, 6.) The Court disagrees on both counts, more or less for the same reasons that support denying KB Farms's motion to exclude Ghaedian.

24. Poling's education and experience are sufficient to qualify him as an expert in this area. Poling is a professor at North Carolina State University, with substantial experience in agricultural economics. (Poling Report 2; *see also* Br. in Opp'n to Def.'s Mot. Lim. 2, ECF No. 100 ["Pl.'s Opp'n"].) He holds a Ph.D. in pomology and viticulture—the science of growing fruit and the study of grape cultivation, respectively. (Poling Report 2.) Moreover, much of his experience is specific to muscadine grapes. (*See* Poling Report 2.)

25. Nature's Pearl contends that Poling is not an expert in fermentation because he testified in his deposition that he is "not an expert in that area." (Def.'s Br. in Supp. Ex. 2 at 62:17–18.) Viewing Poling's testimony in context, though, the Court does not construe his statement as an admission that he is unqualified. Rather, Poling made clear that he is knowledgeable about fermentation because of his experience with muscadine grapes. (Def.'s Br. in Supp. Ex. 2 at 62:14–64:12, 74:15–75:1.) The Court is satisfied that Poling's experience will allow him to educate a lay jury about the general principles at issue (which, as noted, are largely undisputed). Nature's Pearl may question Poling about his qualifications on cross-examination, just as KB Farms may do so with Ghaedian. *See, e.g., Holbrook*, 80 F.3d at 782.

26. The Court also concludes that Poling's causation opinion is sufficiently reliable. Poling's report clearly states the assumptions upon which he bases his

opinion, including, for example, that KB Farms shipped the grapes under refrigeration. (*See* Poling Report at 8.) As discussed, the *Daubert* standard "does not preclude testimony merely because it may be based upon an assumption." *In re TMI Litig.*, 193 F.3d 613, 677 (3d Cir. 1999). Nature's Pearl contends that Poling failed to take into account the two-day delay between harvesting and shipping, but arguments that Poling should have relied on better or different assumptions go to the weight of his testimony, not its admissibility. *See In re Air Cargo*, 2014 U.S. Dist. LEXIS 180914, at *117, 118; *see also Synergetics, Inc. v. Hurst*, 477 F.3d 949, 955 (8th Cir. 2007) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." (quoting *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001))).

27. The Court denies Nature's Pearl's motion to the extent it seeks to exclude Poling's causation opinion.

## B. Damages

28. Poling divides his damages opinions into two parts. In section 8 of his report, Poling calculates the lost profits that KB Farms incurred when Nature's Pearl refused to accept its 2015 harvest. (*See* Poling Report 8–14.) In section 9, Poling calculates future lost profits that KB Farms expects to incur through 2031. (*See* Poling Report 14–15.)

29.     Nature's Pearl asks the Court to exclude both.  It argues that Poling's calculations are speculative and methodologically flawed, and therefore unreliable under Rule 702.

1.  Lost Profits for 2015

30.     After Nature's Pearl terminated the parties' contract, KB Farms tried, without success, to sell its 2015 harvest to others.  As the grapes ripened, they were left on the vine and lost.  Employees of KB Farms surveyed the vineyard at that time in an effort to estimate the crop's yield potential.  Poling cites this yield study in his report and relies on its data as one factor in estimating lost profits for the 2015 harvest.

31.     Nature's Pearl argues that Poling's use of this 2015 yield study renders his opinion unreliable.  It points, first, to Poling's deposition testimony in which he characterized the study as "biased."  (*See* Def.'s Br. in Supp. 7.)  As Poling explained, the employees who carried out the study attempted to choose representative vines but did not employ sampling techniques throughout the vineyard.  (*See* Def.'s Br. in Supp. 7; Pl.'s Opp'n 5–6.)  Although Poling attempted to account for that issue by making adjustments, Nature's Pearl contends that those adjustments were arbitrary. (*See* Def.'s Br. in Supp. 8–10.)

32.     The Court disagrees.  Although Poling acknowledged in his deposition that the 2015 yield study was not sophisticated, he stressed that it produced good, useful data.  (*See* Def.'s Br. in Supp. Ex. 2 at 82:12–19; *see also* Pl.'s Opp'n 6.)  His report provides    ample    support    for    that    conclusion    and    demonstrates    a    thorough

understanding of both the methods that were used and the nature of the data it produced. (*See* Poling Report 8–14.) Poling described the study as "biased" only in the sense that it had been conducted by laypersons, not that KB Farms manipulated the results.

33.     Furthermore, Poling did not accept the 2015 yield study at face value. He determined, based on his experience and other historical data, that the yield estimates were too high, even for an excellent growing season. (*See* Poling Report 11.) He then adjusted the yield figures to provide a more accurate estimate of the 2015 crop yield. (*See* Poling Report 11; *see* Pl.'s Opp'n 7, 8.)

34.     These adjustments were not unreliable, as Nature's Pearl contends. As an example, Poling compared the 2015 data with yield data from KB Farms's previous harvests. In doing so, Poling excluded the 2013 harvest, which was largely lost due to adverse weather conditions. (*See* Poling Report 10.) Nature's Pearl characterizes this decision as arbitrary, designed to artificially inflate the expected crop yield. Not so. Poling explained that 2015 was an excellent year for growing conditions. (*See* Poling Report 9.) By contrast, 2013 was an abnormally poor year, which KB Farms does not dispute. Had Poling used data from 2013 to assess the accuracy of the 2015 yield study, it would not have been an apples-to-apples comparison. Poling's exclusion of the 2013 data is therefore reasonable and does not render his opinion unreliable. The Court has considered Nature's Pearl's arguments about Poling's other adjustments and finds them equally unpersuasive.

35. There is one final matter, though, that could affect the admissibility of Poling's opinion. Nature's Pearl argues that Poling improperly inflated his calculation by using a contract price of $700 per ton, which reflects a $500 market price plus a $200 premium. Nature's Pearl argues that the contract's price term does not include a $200 premium over and above the market rate. KB Farms, by contrast, argues that it does. Whether it was reasonable for Poling to add a premium depends on the outcome of this interpretive dispute. In a separate Order, the Court has directed the parties to brief the issue and, as a result, defers a final decision as to the reliability of Poling's calculation of lost profits for the 2015 harvest.

## 2. Future Lost Profits

36. Finally, in section 9 of his report, Poling calculates future lost profits for the years 2017 through 2031—in other words, the profits KB Farms would have received through the end of the contract's 20-year term had Nature's Pearl not terminated it. Nature's Pearl seeks to exclude this opinion for a variety of reasons.

37. "Damages for breach of contract may include loss of prospective profits where the loss is the natural and proximate result of the breach." *Mosley & Mosley Builders v. Landin, Ltd.*, 87 N.C. App. 438, 446, 361 S.E.2d 608, 613 (1987). "Absolute certainty is not required but evidence of damages must be sufficiently specific and complete to permit the jury to arrive at a reasonable conclusion." *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.*, 292 N.C. 557, 561, 234 S.E.2d 605, 607 (1977) (citation and quotation marks omitted). The injured party must prove its lost profits with "reasonable certainty," not "hypothetical or speculative forecasts of losses." *Iron*

*Steamer, Ltd. v. Trinity Rest., Inc.*, 110 N.C. App. 843, 847, 431 S.E.2d 767, 770 (1993) (internal citation and quotation marks omitted).

38. Nature's Pearl argues that Poling's calculation of future lost profits is speculative. It notes, among other things, that Poling assumed "that all variable expenses such as harvesting and trucking costs will remain constant over the 20-year contract duration." (Def.'s Br. in Supp. 12.) This assumption, Nature's Pearl contends, is unfounded because "[c]ommodities such as oil prices change over time, as do labor costs." (Def.'s Br. in Supp. 12.)

39. In response, KB Farms does not predict that variable costs will, in fact, remain stable from now until 2031. Rather, KB Farms argues that Poling was not required to project future changes to variable costs. According to KB Farms, if Poling had adjusted costs for inflation, "he would have needed to similarly inflation-adjust the projected revenue numbers. Instead, he reached the same result by adjusting neither the revenue figures nor the cost figures for inflation." (Pl.'s Opp'n 12.)

40. This approach is deeply flawed. For one thing, Poling provides no reasoned basis for it. His report cites no economic principle that would support holding costs and revenues steady in today's dollars in lieu of projecting future costs and revenues and then discounting them to present value. Nor does he cite any basis to support an assumption that costs and revenues will increase over time at exactly the same rate. That alone is a sufficient reason to exclude his opinion as unreliable. *See Praxair, Inc. v. Airgas, Inc.*, 2000 NCBC LEXIS 5, at *26 (N.C. Super. Ct. Aug. 14, 2000) (excluding expert opinion based on "an undisclosed methodology"); *see also TK-7 Corp.*

*v. Estate of Barbouti*, 993 F.2d 722, 733 (10th Cir. 1993) ("In order to establish future lost profit damages with reasonable certainty, the plaintiffs at a minimum were required to present testimony fully explaining how the projection of future sales was calculated and the factors upon which it was based."); *Foraker v. Schauer*, 2005 U.S. Dist. LEXIS 46071, at *23 (D. Colo. Sept. 8, 2005) (excluding expert who "failed to provide any competent evidence of either the discount or the inflation rate" and "used a legally improper methodology for calculating plaintiffs' future losses").

41. There is also good reason to conclude that Poling's approach is contrary to sound economic principles. It is highly likely that KB Farms's revenues would be subject to different market pressures than its production costs (e.g., labor and fuel) would be. As costs go up, a producer such as KB Farms may seek to increase its price, but whether the market would support that increase is a question of consumer demand. How consumers respond to price increases changes from industry to industry, and it could be that the demand for muscadine grapes is not overly sensitive to price. But Poling says nothing about the demand side of the equation, and it would be unreasonable to assume, as he apparently does, that price increases have no effect on demand at all. *See JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*, 1998 U.S. Dist. LEXIS 5098, at *22–25 (E.D. Pa. Apr. 15, 1998) (excluding expert's testimony as to lost profits because his failure to project increased costs was unreliable).

42. Poling's approach also guarantees an inflated profit total. As part of his calculation, Poling assumes that the contract's price term includes a $200 premium above market rates. As time goes by, inflationary pressures are sure to reduce the

value of that premium. A $200 premium in 2031 could be worth $150 or less in today's dollars, depending on the rate of inflation. By holding the contract price steady in today's dollars through 2031, Poling negates the impact of inflation and effectively *increases* the premium over time. Because the premium accounts for most of KB Farms's expected profits, this error artificially inflates its damages demand by a substantial margin.

43. In light of these unsupported and speculative assumptions, the Court concludes that Poling's calculation of future lost profits is unreliable and not the product of sound methodology. His opinion is therefore not admissible and should not be heard by the jury. As the Fourth Circuit has persuasively observed, "[s]crutiny of expert testimony is especially proper where it consists of an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it." *E. Auto Distribs., Inc., v. Peugeot Motors of Am., Inc.,* 795 F.2d 329, 338 (4th Cir. 1986) (internal citation and quotation marks omitted); *see also Henkle v. Cumberland Farms, Inc.*, 2017 U.S. Dist. LEXIS 217367, at *5–6 (S.D. Fla. June 20, 2017) (excluding damages opinion not based on sound economic principles); *Chesapeake Corp. v. Sainz*, 2002 U.S. Dist. LEXIS 28702, at *56–61 (E.D. Va. Mar. 19, 2002) (same); *KW Plastics v. United States Can Co.*, 131 F. Supp. 2d 1289, 1293–94 (M.D. Ala. 2001) (same).

44. The Court therefore grants Nature's Pearl's motion to exclude Poling's calculation of future lost profits, including the opinions stated in section 9 and Exhibit

3 of his report.  Having reached this conclusion, the Court does not address Nature's Pearl's other bases for excluding Poling's calculation of future lost profits.

V.
CONCLUSION

45.    For the reasons set forth above, the Court, in the exercise of its discretion, **ORDERS** as follows:

46.    The Court **DENIES** Plaintiff's motion to exclude Ghaedian's testimony.

47.    The Court **GRANTS** Defendant's motion to exclude Poling's testimony as to future lost profits but **DEFERS** its ruling as to Poling's calculation of lost profits for the 2015 harvest, pending resolution of the parties' dispute about the proper interpretation of their contract's price term.  In all other respects, the Court **DENIES** Defendant's motion.

**SO ORDERED**, this the 27th day of December, 2018.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases